IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

RONELL RICHARD, as Administrator )
of the Estate of                 )
EDGAR RICHARD, JR., Deceased,     )
                                  )
                Plaintiff,        )    CIVIL ACTION
                                  )
v.                                )    No.  09-1278
                                  )
BOARD OF COUNTY COMMISSIONERS OF  )
SEDGWICK COUNTY; et al.,          )
                                  )
                Defendants.       )
_____ )

## MEMORANDUM AND ORDER

Before the court are the following:

Motion for Summary Judgment by defendant Paul W. Murphy
(Doc. 444); Plaintiff's Response (Doc. 465); defendant's
Reply (Docs. 481, 484);

Motion for Summary Judgment by Conmed defendants[1] (Doc.
440); Plaintiff's Response (Doc. 468); defendants' Reply
(Doc.  483);

Motion for Summary Judgment by Sedgwick County defendants[2]
(Doc. 446); Plaintiff's Response (Doc. 473); defendants'
Reply (Doc. 486-1).

I. Background . . . . . . . . . . . . . . . . . . . . . . . -3-

II. Undisputed facts . . . . . . . . . . . . . . . . . . . -4-
     A. Background . . . . . . . . . . . . . . . . . . . . . -5-

---

[1]Defendants Conmed Healthcare Management, Inc.; Conmed, Inc.; and
Mike S. Hall.

[2]Defendants Board of County Commissioners of Sedgwick County,
Kansas;  Sedgwick County Sheriff Robert Hinshaw (individually and in
his official capacity); Gary Steed; and Saquisha Nelson.

    B. <u>Murphy's Treatment of Richard Before Oct. 2007</u> . . . . <u>-8-</u>
    C. <u>Good Shepherd Admission – October 2007</u> . . . . . . . <u>-10-</u>
    D. <u>Conmed.</u> . . . . . . . . . . . . . . . . . . . . . . <u>-12-</u>
    E. <u>Richard's 2007-08 Incarceration</u> . . . . . . . . . . . <u>-13-</u>
        a. <u>Summary of records</u> . . . . . . . . . . . . . . <u>-13-</u>
        b. <u>Testimony of Conmed personnel</u> . . . . . . . . <u>-18-</u>
    F. <u>February 15, 2008 incident</u> . . . . . . . . . . . . . <u>-25-</u>
    G. <u>Investigation and Aftermath</u> . . . . . . . . . . . . . <u>-28-</u>
    H. <u>Sheriffs' policies; training; supervision of Diaz</u> . . <u>-30-</u>
    I. <u>Opinions of Plaintiff's Experts</u> . . . . . . . . . . <u>-37-</u>

III. Summary Judgment Standards . . . . . . . . . . . . . . . <u>-40-</u>

IV. Analysis . . . . . . . . . . . . . . . . . . . . . . . . <u>-41-</u>
    A. <u>Dr. Paul Murphy</u> . . . . . . . . . . . . . . . . . . <u>-41-</u>
      1. <u>Deliberate indifference to serious medical needs</u>
        . . . . . . . . . . . . . . . . . . . . . . . . <u>-42-</u>
        a. <u>Legal standard</u> . . . . . . . . . . . . . . . <u>-42-</u>
        b. <u>Discussion</u> . . . . . . . . . . . . . . . . . <u>-44-</u>
      2. <u>Failure to Supervise or Train</u> . . . . . . . . . . <u>-49-</u>
      3. <u>Conditions of confinement</u> . . . . . . . . . . . <u>-51-</u>
      4. <u>Failure to Protect Richard's Safety</u> . . . . . . <u>-52-</u>
      5. <u>Tort of outrage</u>. . . . . . . . . . . . . . . . . <u>-54-</u>
    B. <u>Mike S. Hall, P.A.</u> . . . . . . . . . . . . . . . . . <u>-55-</u>
      1. <u>Deliberate indifference to medical needs</u> . . . . <u>-55-</u>
      2. <u>Failure to protect Richard's safety</u> . . . . . . <u>-59-</u>
      3. <u>Tort of Outrage</u> . . . . . . . . . . . . . . . . <u>-59-</u>
    C. <u>Conmed Healthcare Management, Inc.</u> . . . . . . . . . <u>-60-</u>
    D. <u>Conmed, Inc.</u> . . . . . . . . . . . . . . . . . . . . <u>-60-</u>
      1. <u>§1983 claims</u> . . . . . . . . . . . . . . . . . . <u>-61-</u>
        a. <u>Official policy or custom element</u> . . . . . <u>-61-</u>
        b. <u>Causation element</u> . . . . . . . . . . . . . <u>-61-</u>
        c. <u>State of mind element</u>. . . . . . . . . . . . <u>-62-</u>
        d. <u>Discussion</u>. . . . . . . . . . . . . . . . . <u>-63-</u>
      2. <u>Tort of Outrage</u>. . . . . . . . . . . . . . . . . <u>-66-</u>
      3. <u>Respondeat superior</u> . . . . . . . . . . . . . . . <u>-67-</u>
    E. <u>Deputy Saquisha Nelson</u> . . . . . . . . . . . . . . . <u>-67-</u>
      1. <u>Deliberate indifference to medical needs</u> . . . . <u>-68-</u>
      2. <u>Failure to intervene</u> . . . . . . . . . . . . . . <u>-69-</u>
    F. <u>Gary Steed, Robert Hinshaw, and Sedgwick County</u> . . . <u>-72-</u>
      1. <u>Hinshaw – no personal involvement</u> . . . . . . . <u>-73-</u>
      2. <u>Steed / Sedgwick County</u> . . . . . . . . . . . . <u>-73-</u>
        a. <u>Failure to train on mental illness</u> . . . . <u>-73-</u>
        b. <u>Failures relating to medical care</u> . . . . . <u>-76-</u>
        c. <u>Failure to discipline</u> . . . . . . . . . . . <u>-78-</u>

V. Summary of Remaining Claims . . . . . . . . . . . . . . . <u>-80-</u>

VI. Pretrial Deadlines . . . . . . . . . . . . . . . . . . . <u>-81-</u>

VII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . <u>-82-</u>

## I. Background.

In 2008, 59-year old Edgar Richard, Jr. (hereinafter "Richard"), who suffered from severe mental illness, was incarcerated in the Sedgwick County jail. On February 15, 2008, he was involved in an incident with Sedgwick County Detention Deputy Manuel Diaz, during which Diaz repeatedly punched Richard in the face. Richard suffered a broken jaw and other injuries and was hospitalized for an extended period.

Plaintiff contends the defendants deprived Richard of federal rights under color of state law, contrary to 42 U.S.C. § 1983, and damaged him by their tortious conduct. The claims include: use of excessive force; failure of a bystander officer to intervene; failure to supervise officers or agents; failure to train officers or agents; deliberate indifference to serious medical needs; unlawful conditions of confinement; failure to protect a detainee; the tort of outrage; and respondeat superior liability for an agent's unlawful actions. The named defendants include: former Sedgwick County Detention Deputy Manual Diaz, Jr.; the "Sedgwick County defendants" (the Board of Sedgwick County Commissioners, Sedgwick County Sheriff Robert Hinshaw[3], former Sheriff Gary Steed, and Sedgwick County Detention Deputy Saquisha Nelson); the "Conmed defendants" (Conmed, Inc., Conmed Healthcare Management, Inc., and Mike S. Hall, P.A.) ; and Paul W. Murphy, M.D.

---

[3] Hinshaw is named in his personal and official capacities. Hinshaw was replaced as Sheriff of Sedgwick County by Jeff Easter on December 17, 2012. The official capacity claim against Hinshaw is simply another way of asserting a claim against Sedgwick County. See Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010).

## II. Undisputed facts.

The court admonished counsel in a letter dated September 10, 2013, regarding the importance of following the rules regarding motions for summary judgment (Doc. 420). Apparently the court's words were largely ignored. Indeed, the court cannot recall a case with a more problematic presentation of uncontroverted facts. The problems are too numerous to catalogue,[4] but it is surprising that counsel with

---

[4]By way of illustration, some of defendants' asserted facts are not supported by the cited deposition or exhibit pages. Other factual assertions include entire paragraphs copied from conclusory affidavits. One or more briefs attaches hundreds of pages of exhibits without a useable index.

In response, plaintiff "controverts" nearly all of defendants' asserted facts – except that plaintiff never actually addresses those facts. Rather, plaintiff contends defendants' facts are all "misleading" or "inaccurately imply" things because defendants have not mentioned a slew of additional facts, which plaintiff proceeds to set forth, accompanied by string cites and cross-references resembling the tax code. [For example, in response to Sedgwick County defendants' fact no. 53: "(See ¶¶ 7, 9, 11, 21, 25, 41-44 & 47, 51, 55, AF¶¶5, 6-11, 22, 25-26, 34-44, 47)." By rule, this failure to address and specifically controvert an opposing party's facts means they may be deemed admitted by the court. See Fed. R. Civ. P. 56(e); D. Kan. R. 56.1(b). These deficiencies mirror the ones described previously by Judge Vratil in Bruner-McMahon v. Hinshaw, 846 F.Supp.2d 1177 (D. Kan. 2012). Plaintiff has also filed one or more briefs without any exhibit index (Doc. 465).

After "controverting" defendants' facts in this for 15 or so pages, plaintiff lists a separate statement of additional facts, which is the appropriate way of inserting new facts not included in the opposing memoranda. Taken together, plaintiff's factual presentation is thoroughly garbled. Some of the defendants strive to address all of these "UF" [defendants' uncontroverted facts], "AF" [plaintiff's additional facts], and "PS" [plaintiff's supplemental facts], but the result is so complex it is difficult to decipher. (E.g., Doc. 486-1 at 6: "PS 38, 40, 51, 62 and AF 2, 4, 5, 6, 16, 20, 21, 23, 32 are uncontroverted for these motions. PS 9, 12, 21, 25, 26, 41, 43, 50, 55, 60, 61 make circular references to Plaintiff's AFs or its responses to other UFs. The responses to the cited AFs and other PSs are incorporated."). Some defendants also object to a number of plaintiff's exhibits as hearsay, arguing the documents do not qualify as business records, although the pretrial order appears to stipulate that such documents will be considered business records under Rule 803(6). (Doc. 422 at 5).

the combined experience represented here cannot produce statements of uncontroverted facts in accordance with those rules.[5]

A. Background.

The record shows that Richard suffered from severe mental illness for most of his adult life. He was seen at emergency rooms or was hospitalized about 25 times since 1982. He was admitted on

---

[5] The deposition excerpts on summary judgment frequently contain as much argument between counsel as factual information from witnesses. Just one example:

Q. Do you agree that whether or not an emergency situation exists is a judgment call?
MR. HERNANDEZ: What – are you talking about psychiatric or medical or what?
MR. WALL: Please don't do that, please. Just make objections. You've violated the rule.
*  *  *
MR. HERNANDEZ: If there's been any violation, it's been the fact that you've been repetitious, by your own admission, going over a deposition that you took yesterday. If you have it. I don't know if you have it because we haven't seen a copy.
MR. WALL: I haven't been repetitious. Please don't change the subject.
MR. HERNANDEZ: You have been repetitious.
MR. WALL: No, you've never even made an objection to repetitious.
MR. HERNANDEZ: I can't just because you don't want me to say what it is, [want] me to tell you what it is? I'll tell you in real time.
MR. WALL: I'd like you to be quiet, is what I'd like –
MR. HERNANDEZ: I'd like you to hurry on, but we can't all have our wishes.
Q. Sir, Exhibit 17 was shown to you yesterday, that's Becca Hess, that describes Edgar Richard as being courteous, not being profane[,] do you remember that exhibit?
MR. HERNANDEZ: Doctor, pursuant to the court order, Doctor, you don't have to get into repetitious answers again. Same question.
MR. WALL: This is – I'm leading up to the question. Mr. Hernandez, please don't point your hand at me.
MR. HERNANDEZ: I'm not pointing my hand.
MR. WALL: All right. That's a lie. That's not true.
MR. HERNANDEZ: You just pointed your hand at me. Don't call me a liar.
MR. WALL: Mr. Hernandez –
MR. HERNANDEZ: If anybody's a liar here ...
MR. WALL: Mr. Hernandez, you're being very abusive.
MR. HERNANDEZ: So are you, Mr. Wall.

numerous occasions to Osawatomie State Hospital, the Topeka State Hospital, Via Christi Medical Center in Wichita, and Via Christi Good Shepherd Campus hospital in Wichita. He was also seen a multitude of times by psychiatrists and other professionals at COMCARE, a Sedgwick County agency that provides mental health and substance abuse services.

Richard was diagnosed as suffering from schizophrenia or schizoaffective disorder, among other things. He suffered from hallucinations and delusions and frequently heard voices. Sometimes the voices told Richard to kill himself or to harm others. He often asserted that he was Jesus. He was at times aggressive, hostile, and verbally or physically threatening to others, including toward his care providers and the police. Richard usually responded to treatment and improved after a period of hospitalization and medications, but sometimes it took weeks or even months to get him to a stable condition. Plaintiff cites evidence that Richard was able to function well at times. But he also frequently quit taking his prescribed psychotropic medication, which was usually followed by periods of bizarre behavior, delusions and hallucinations.

For example, records of Richard's past behavior indicate that while he was in a holding cell at the jail in 1986, he urinated on the floor, masturbated, talked about killing others, and claimed to be God. A 1999 report indicated that he set fire to an apartment "to get rid of the demons." In 2001 he bit a staff member at Good Shepherd. On several occasions he caused toilets to overflow, such as during a 2002 stay at Good Shepherd when tried to flush drapes or a shower curtain down the toilet. Richard also had substance abuse problems.

He used cocaine, liquor and other substances. He frequently made sexually inappropriate remarks to female health workers and sometimes inappropriately touched them. In 2006 he reportedly masturbated in a McDonald's restaurant and inappropriately touched a female member of his "Breakthrough Club," a mental health support group. In September 2006 he was admitted to Good Shepherd after police found crack cocaine in his pocket. Treatment notes from that episode indicate he was verbally aggressive and threatened to kill the police, and he required a "prn"[6] injection during his stay when he became upset with hospital staff.

On October 4, 2006, Richard was in a cell waiting to be booked into the Sedgwick County Adult Detention Facility (hereinafter "the jail"). According to a report by Sgt. Eke Mba, Richard made derogatory remarks about every person passing through the cell and "urinated, defecated, and spat all over" the cell. He spat at Sgt. Mba and refused to come out of the cell. A team of officers had to go in and get him. A struggle ensued in which Richard hit a deputy in the face and broke his glasses.

During 2006-2007 Richard had three pending criminal cases in Sedgwick County District Court. The charges included battery on a law enforcement officer, aggravated battery on a law enforcement officer, and possession of cocaine. On November 28, 2006, the presiding judge held a hearing and found that Richard was competent to stand trial. That finding was apparently based on a competency evaluation performed

---

[6] Pro re nata, or as the situation demands. As used in the notes the term refers to an involuntary emergency injection given when an agitated patient presents a danger to himself or others.

by Dr. Constance Gaston of COMCARE on November 13, 2006. The evaluation noted that Richard was currently taking the antipsychotic medications being provided him at the jail by Conmed (the contract medical provider at the jail), and that staff noted he can become violent when he stops taking his medications. Richard subsequently entered a guilty plea in all three cases. On June 5, 2007, the presiding judge imposed an imprisonment sentence of 31 months but suspended it and placed Richard on 36 months' probation.

Richard was seen as an outpatient by COMCARE psychiatrist Dr. Lin Xu on October 3, 2007. The treatment notes point out that Richard had been on disability for severe mental illness since 1988 and was being treated for schizoaffective disorder and personality disorder, NOS [not otherwise specified]. The notes also show that Richard had severe medical conditions including colon cancer, primary hypertension, and non-insulin dependent diabetes. Richard had undergone surgery in July 2007 to have part of his colon removed due to colon cancer. The notes show that Richard declined to undergo the chemotherapy recommended by his oncologist.

B. <u>Murphy's Treatment of Richard Before Oct. 2007.</u>

Paul Murphy. M.D., graduated from the University of Kansas School of Medicine in 1982 and completed a residency in psychiatry in 1986. He thereafter practiced psychiatry in Wichita, Kansas. He is licensed in six states and is board certified in adult psychiatry.

Dr. Murphy first saw Richard on March 12, 2002 at Good Shepherd. Richard was admitted after having appeared at an emergency room, smeared in grease, reporting auditory and visual hallucinations. Richard reported that sometimes his medications "just stop working"

so he abused crack cocaine "to help with the voices." Dr. Murphy diagnosed Richard as having paranoid schizophrenia and polysubstance abuse. He treated Richard with antipsychotic and other medications. Dr. Murphy's discharge summary indicates Richard improved with medication, although at some point in his stay Richard required a prn antipsychotic to control his agitation. He was discharged on or about March 18, 2002.

Murphy saw Richard again at Good Shepherd in April 2002. Richard reported he had stopped taking his medications. He was noted as loud, hostile, and speaking with delusional content. Dr. Murphy's notes indicate that Richard was "grossly psychotic" and exhibited bizarre behavior. Murphy noted that Richard took his medications during this stay but "continued to display psychotic thought processes and difficultly maintaining control" and continued to exhibit bizarre behavior. As a result, a petition was filed under the Kansas Care and Treatment Code and Richard was transferred to Osawatomie State Hospital for treatment.

Murphy saw Richard more than four years later at Good Shepherd, in July 2006, following the previously mentioned incident at McDonald's. During that stay it was noted that Richard threatened staff, cussed at them, flooded his bathroom floor and was observed talking to himself. He required restraints and prn medication at some point. Richard's behavior again resulted in a petition being filed for his involuntary commitment to Osawatomie State Hospital for treatment, where he was eventually stabilized and released.

Dr. Murphy saw Richard again on November 20, 2006, and on February 26, 2007, presumably at the jail clinic. Murphy ordered an

adjustment in Richard's medications on these occasions.

On March 19, 2007, Dr. Murphy saw Richard for the purpose of evaluating his competency to make health care decisions in connection with a recommended surgery for colon cancer. At the time Richard was refusing surgery. Dr. Murphy concluded that Richard "is competent to make the choice regarding his healthcare decision & TX [treatment] options." Richard had the surgery on July 16, 2007.

C. Good Shepherd Admission - October 2007.

On October 29, 2007, Richard was admitted to Via Christi Good Shepherd Hospital after having been off his medications for at least 3 to 4 days. Medical history notes report that during the prior week he had been walking down the street with a knife stating that he was going to "kill black people." Richard was seen by Dr. Laurie S. Coyner, who restarted Richard on his medications. Her notes indicate Richard was physically intimidating and verbally threatening towards staff during his stay. He was sexually inappropriate and was observed masturbating in front of staff and patients. He threatened to kill several people in the hospital. He appeared to be responding to internal stimuli but denied having hallucinations.

On or about October 31, 2007, Dr. Coyner signed a Mental Health Certificate relating to Richard. Under the Kansas Care and Treatment Act, such forms are used to support a petition to have a mentally ill person involuntarily committed for care and treatment. See K.S.A. § 59-2957. Coyner certified that Richard suffered from a mental disorder and was in need of treatment; that he lacked the capacity to make an informed decision about treatment; and that he was likely to cause harm to himself or others or to property of another. An accompanying

-10-

petition for an order allowing involuntary treatment of Richard was prepared by an employee of Good Shepherd, at Dr. Coyner's direction, and was filed with the Probate Department of the Sedgwick County District Court on October 31, 2007.

While Richard was still at Good Shepherd, Dr. Coyner was contacted by Richard's Intensive Supervision Officer (i.e., probation officer), who informed her there was an outstanding warrant for Richard. She said if Coyner felt Richard was a danger to others and could not be safely stabilized in an inpatient setting, he could be incarcerated and treated at the jail. While Coyner was talking to the officer on the phone, Richard threatened to kill one of the nurses in the unit. Coyner informed the officer of this latest threat and opined that Richard was an ongoing danger to others. The doctor agreed that incarceration rather than inpatient treatment was appropriate under the circumstances. Richard's probation officer authorized Richard's arrest and came to Good Shepherd on October 31, 2007 with law enforcement officers, and took Richard into custody.

Coyner's discharge summary states that Richard was "alert and oriented times four"; that he "continues to make threats to harm others and has continued to be sexually inappropriate and, also, physically intimidating and verbally threatening towards staff and peers"; and that he was not appropriate for readmission to Good Shepherd. Coyner wrote that Richard would "be more appropriate for treatment either in a detention facility or, possibly, at Larned State Hospital for long-term treatment." His prognosis was judged as "poor due to extensive history of noncompliance, substance abuse, and recidivism."

On October 31, 2007, Richard was incarcerated at the Sedgwick County jail for alleged probation violations. On November 2, 2007, Richard's probation officer obtained a judicial arrest warrant for the alleged violations, which included threatening to kill a person, two instances of carrying a concealed weapon, threatening harm to staff and patients of Good Shepherd Hospital, and lewd and lascivious behavior.

D. Conmed.

At all relevant times, Conmed Inc. (hereinafter "Conmed") contracted with Sedgwick County to provide medical care, including mental health care, to inmates at the jail. Conmed operated the jail's medical clinic and its mental health unit. Conmend contracted with Bryon McNeil, M.D., to provide medical services to inmates at the jail. McNeil was designated as the medical director.

Conmed contracted with Paul Murphy, M.D. to provide mental health services to inmates at the jail. The agreement required Dr. Murphy to visit the jail a minimum of four hours each week to provide on-site psychiatric examinations. It also provided that Dr. Murphy would provide on-call psychiatric coverage 24 hours a day, 365 days per year.

Conmed employed Mike Hall, P.A., as a physician's assistant in the mental health unit. Hall was supervised by Dr. Murphy and, when Murphy was not available, by Dr. McNeil. Conmed also employed Registered Nurse Lisa Armstrong and Licensed Master Social Workers Karen Barnt and Andrea Skelton to work in the jail's mental health unit.

E. Richard's 2007-08 Incarceration.

-12-

a. <u>Summary of records</u>. Richard engaged in bizarre and disruptive behavior after he was booked into jail. Inmate logs show that on November 2, 2007, he was continually calling deputies from his cell claiming to be Jesus Christ. He made unreasonable demands and then cussed at deputies when his requests were denied. He put his linen in his toilet, prompting deputies to shut off the water to the cell before he could flush it.

The jail's "I/LEADS" computer information on Richard, which detention deputies had access to, contained alerts for "assaults on staff" and "dangerous."

On November 4, 2007, Richard was placed on a "racked watch" because of his bizarre behavior. This meant he was confined to his own cell and was segregated from other inmates. Jail policy required deputies to check on him approximately every 30 minutes. Inmates on racked watch could contact the pod deputy by intercom. They were allowed to send and receive mail, have visitors, and make phone calls. Logs indicate Richard frequently tied up the intercom. Although Richard could sometimes see and hear other inmates from his cell, the window on his cell door was sometimes covered over with paper by guards in response to Richard's frequent banging on the cell door.

Richard was allowed to leave his cell each day for showers. He was also taken out of his cell for court, medical and other appointments.

On November 5, 2007, Sergeant Rhonda Freeman sent an email to the Conmed medical staff informing them that Richard was on a racked watch due to bizarre behavior and asking them to schedule a mental health evaluation if one was not already scheduled. The request was forwarded

to Hall, Barnt and Armstrong the next day.

On November 6, 2007, Physician's Assistant Hall prescribed valporic acid (a mood stabilizer), trazadone and fluphenazine (antipsychotics), and benzatropine (to counter side effects of antipsychotics) for Richard. These medications were used in part because Richard had been treated with them in the past and had tolerated them well. Hall entered an order in the chart directing that Richard be seen by Dr. Murphy on November 12, 2007, and that a mental health chart review occur in two weeks. There are no records showing that Dr. Murphy saw Richard on that date or, for that matter, at any time thereafter up to the February 15, 2008 incident.

After the November 6, 2007 prescription by Hall, Conmed offered Richard his medications on a daily basis. Food and medications were brought to him each day.

On or about November 15, 2007, Dr. McNeil, the medical director, saw Richard and spoke to him about his colon cancer and the benefits of chemotherapy. Richard again declined chemotherapy. McNeil's notes indicate Richard was "awake, alert and oriented times 3, is very appropriate, bright affect and very interactive today," and he "has no current complaints." The medical history in McNeil's notes and assessment state that Richard's schizophrenia was "well controlled." McNeil explained to Richard at some length the benefits of chemotherapy for his colon cancer, but his notes reflect that "Mr. Richard['s] feeling at this point is at his current age, his life expectancy will be less than that of a potential recurrence of tumor

and he does not desire to have chemotherapy at this time."[7] The notes state that Richard "clearly understands my concerns about his cancer and potential for recurrence" without chemotherapy and indicate that Richard was agreeable to follow up on an out-patient basis.

On November 20, 2007, Hall reviewed Richard's chart. He continued Richard's medications and ordered a medication review in four weeks.

On November 22, 2007, a deputy spoke with Hall about giving Richard an injection to calm him down. The deputy's log states that Richard had attempted to flood his cell, was cussing at everyone, was screaming loudly and making threats, was demanding to be fed, and was continuing to call the deputy a "white motherfucker." Hall declined to authorize injections even though the deputy said to Hall that injections had routinely been given to inmates in the past.

On November 27, 2007, Barnt saw Richard in the pod. Her mental health progress note indicates the reason for the visit was an "officer request F/U [follow-up]." The notes reflect that Richard was disheveled, had bad hygiene, had been urinating out of his cell door, and could not remember when he last took his medications. Her notes state that he had sporadic medication compliance. Her overall assessment was that he was "unchanged" and the plan was for him to remain on the current medication review schedule. Barnt testified that because some non-schizophrenics urinate out of their cell doors, such behavior by Richard didn't raise enough of a red flag for her to go running back to Dr. Murphy or someone to say "you have to do something

---

[7] The notes show that Richard had a tumor surgically removed in July of 2007 and reported to McNeil that he was doing well since then with no reported symptoms.

today." She believes she also factored in that Richard was a diabetic whose blood sugar was "out of whack," and people with that problem sometimes behave in ways they do not recall when their blood sugar is back in bounds.

On December 6, 2007, Judge Warren Wilbert of the Sedgwick County District Court, the judge presiding over Richard's pending criminal cases, granted a defense motion for a competency evaluation. The order provided that Richard's criminal cases were suspended until further order and directed that a competency evaluation of Richard be made at COMCARE of Sedgwick County to determine if Richard was able to understand the nature and purpose of the criminal proceedings against him and to assist in his own defense. The director of COMCARE was ordered to report back to the court within 90 days with the results of the examination and an opinion concerning Richard's competence to stand trial. Apparently due to a mixup by the attorneys in the criminal case, however, the court's order was not delivered to COMCARE until February 22, 2008.

On December 17 or 18, 2007, Dr. McNeil again counseled Richard about his colon cancer, but Richard again declined chemotherapy.

On December 18, 2007, Hall saw Richard and noted that Richard was cooperative and his mood was congruent, but he was somewhat disheveled. According to Hall's notes, Richard felt his medications were helping somewhat with the voices (auditory hallucinations) but he was still bothered by them. Hall noted that Richard "seems mostly controlled on current meds." He ordered an increase in Richard's dosage of fluphenazine (antipsychotic), lab work to check Richard's valporic acid (mood stabilizer) level, a chart review when available,

and a medication review in six weeks. On December 19, 2007, Hall noted Richard's refusal of the valporic acid labs.

On or about December 26, 2007, Barnt noted a clinician's recommendation that injections be started on Richard. The record cited by the parties does not clearly establish who made this recommendation or the circumstances behind it, although indications are that the clinician was Hall.

On or about December 27, 2007, Hall saw Richard and noted he was not taking his oral medications at all. His hygiene was poor, he was uncooperative, argumentative, defensive and tense. He became belligerent with Hall and then "returned to normalcy for him." He was responding to internal stimuli. Hall's notes indicate his assessment was "unchanged" but that Richard's schizophrenia was worsening without medications. The "subjective" portion of Hall's progress note included the comment: "Implement long-acting antipsychotic med. when needed." It also said Hall will "[continue] to monitor daily." On or about that same day, Hall ordered that Richard's medications be continued and he scheduled a review in one week. He ordered that Richard could be given short-acting injections of 10 mg of fluphenazine (antipsychotic) with 2 mg of Cogentin (benzatropine - to reduce side effects) for acute aggressive behavior every six hours as needed. Hall and Dr. Murphy had discussed the availability of such "as needed" [prn] short-term injections should Richard become acutely suicidal or agitated.

Records show that Richard was offered psychotropic medication twice a day, for a total of 197 times, between November 6, 2007 and February 15, 2008. Some days he took all of his pills, while on other days he took one, some, or none at all.

Records show that Richard requested or was scheduled for blood sugar tests 80 times on 53 different dates through February 14, 2008. He refused testing on 16 of those occasions.

b. <u>Testimony of Conmed personnel</u>.

Dr. McNeil testified that Richard's behavior was bizarre at baseline. He said it would not be unusual for Richard to expose himself to female staff and say inappropriate things to them, or for him to unnecessarily come to "sick call" at the clinic multiple times a day to get his blood sugar checked. When Richard became inappropriate and refused to comply with requests to act properly, the clinic staff had deputies escort Richard from the clinic back to his cell.

Dr. Murphy testified that he saw Richard on occasion during his incarceration. Defendants cite no evidence, however, that Murphy ever formally evaluated Richard, nor do they provide any evidence of what these encounters consisted of. According to Murphy he also checked on Richard several times in his cell, but again, no evidence is provided that any psychological evaluation or other substantive meeting occurred during these "checks."

Dr. Murphy testified Richard's behavior had been fairly consistent ever since Murphy first treated him at Good Shepherd in 2002. He said Richard was intrusive and profane whether or not he was medicated and that his typical behavior included threats to hurt deputies and sexual remarks to females but that "he never followed through." Murphy said it was not unusual for Richard to kick and bang on his cell, scream, yell, talk gibberish, tear up pieces of toilet paper and dance around them, and stay up all night. Murphy also said

it was not unusual for Richard to expose himself and to say inappropriate things to women. He said Richard's behavior "waxed and waned." Dr. Murphy testified there was no long-term harm to Richard from these behaviors or from Richard claiming to be "Black Jesus" or urinating under his cell door. Murphy said if Richard had physically tried to harm himself or had laid hands on another inmate or a deputy, he would have directed that he be medicated. Murphy testified that Richard's behavior in the jail was not causing permanent harm and did not indicate that an emergency existed.

The fact that Richard was sometimes refusing to take his medication was known by a number of the mental health staff at the jail, including Hall and Murphy. Murphy was aware that Richard sometimes took his medication and sometimes did not. Murphy generally did not examine records showing Richard's behavior but relied on Hall to give him the pertinent clinical information about Richard.

Both Dr. Murphy and Dr. McNeil told Hall that Richard's behavior waxed and waned with or without medications. Dr. Murphy instructed the mental health team to alert him if there was a change or a problem with Richard, indicating he wanted to be notified if Richard engaged in behavior different from the sort described above, which Murphy considered "normal" or baseline for Richard. Murphy said his sources of information about Richard included personal examination, the verbal report of the Conmed administrator, the verbal report of any nurse or mental health professional who saw Richard, and a verbal report from Hall. Dr. Murphy understood that mental health staff members were to make daily rounds for all inmates in administrative segregation and all racked inmates who were mentally ill.

Dr. Murphy was not involved in the original decision to place Richard in segregation, but he thought segregation was beneficial for Richard, in part because it protected him from abuse by other inmates. Murphy was ordinarily at the jail only one day out of each week. He said the mental health staff was supposed to call him if there was some problem that required his attention.

Dr. Murphy's understanding was that a long-acting type of injection would have required a court order and he could not authorize such injections on his own. Murphy took no steps to obtain a court order authorizing forced, long-term injections of Richard. Murphy's testimony indicates that although he believed such injections would have been medically advisable, he believed Richard had a constitutional right to refuse medication and could not be forced to take the long-acting medication against his will. Plaintiff points out that Dr. Murphy subsequently administered long-acting injections to Richard without his consent and without a court order after Richard was hospitalized due to the incident with Diaz.

Dr. Murphy testified that he could administer a quick-acting injection to Richard against his will on an as-needed basis if Richard was an acute danger to himself or others. Murphy testified he had the authority to make such a determination and to order forced medication without anyone else's approval, but he said such injections would only have affected Richard's behavior for a matter of hours. He indicated that short-acting injections could be given for no more than a 72-hour period without a court hearing. Murphy testified he had previously been told by both the district attorney's office and by a succession of local probate judges that he could not obtain a "civil hold" (that

is, he could not initiate a civil care and treatment proceeding through a probate court petition) on an incarcerated patient facing criminal charges. His understanding was that in criminal cases, the procedure for getting a defendant who refused psychotropic medication transferred to a state hospital was for an attorney in the criminal case to request a competency evaluation order from the court.[8]

Murphy testified he believed early on in Richard's incarceration that Richard needed to go to Larned State Hospital for treatment, but he did not believe he had authority to order such a transfer. Murphy testified he attempted to get Richard sent to Larned by directing a staff member to contact the attorneys in Richard's criminal case and ask them to request a court-ordered competency evaluation at Larned. There is no documentation of such a request, however. The public defender who represented Richard at the time testified that no one from Conmed approached her with concerns about Richard's competency.

Dr. Murphy testified that he believed Richard was in touch with reality almost all of the time during his incarceration. According to Murphy, although Richard had hallucinations he understood that they were hallucinations. Murphy also said Richard understood his environment – for example, he knew that he was in jail and knew who he was talking to. Murphy said the fact that Richard had delusions and

---

[8] Under Kansas law, if a defendant charged with a felony is found incompetent to stand trial, the trial court must commit him for evaluation and treatment to a state security hospital or another appropriate institution. K.S.A. § 22-3303. If after six months he is unlikely to obtain competence in the foreseeable future, the court must then direct the Secretary of Social and Rehabilitation Services to commence involuntary commitment proceedings under the Probate Code.

hallucinations did not put him out of touch with reality.

Hall testified there were two types of injections for inmates: a long-acting one that can last from one to four weeks, and a quick-acting one that can be given every six hours if an inmate is aggressive or hurting himself. Although Hall's prn order authorized the use of the quick-acting type, Richard was never given the injections because according to Hall it was "not clinically indicated," meaning it never became necessary.

Hall knew that deputies monitored Richard every 30 minutes. He relied on them "to be his eyes and ears" in the pods. Hall monitored Richard through Inmate Observations Forms, inmate logs, phone calls to deputies, the "ILEADS" scheduling system, and his medical chart. He spoke to nurses and social workers in the mental heath unit and sometimes asked them to check on Richard to see if he would take his medications.

The information available to Hall showed that Richard at times engaged in such behavior as proclaiming himself to be "Black Jesus," cursing at deputies or others, talking to himself, throwing a tray at a deputy, attempting to clog his toilet with toilet paper or linens, banging on his cell door, repeatedly calling deputies on the intercom, yelling in his cell, spitting on his cell door window, urinating under his door or on his lunch tray, making sexually inappropriate comments, masturbating, refusing medications, and refusing showers.

Conmed's policy on involuntary treatment of inmates provided that inmates shall not be subject to treatment against their consent or against their will except in rare instances. If an inmate was a danger to himself or others, the mental health director could order

administration of a psychotropic medication regardless of the inmate's wish or consent.

Andrea Skelton, LMSW, began work for Conmed on January 21, 2008. Her education included training on how to evaluate if a person's mental capacity is impaired. She had no medical training, however, and was not certified to give medications or injections. She initially received some on-the-job training from Barnt and Armstrong. On February 4, 2008, Skelton met with Richard for the first time. Hall had asked her to visit Richard to see if he would take his medications. Richard told her he was not going to be taking his medications and that he did not have to.

Lisa Armstrong, R.N., testified she frequently saw Richard on her daily rounds. On February 11, 2008, Armstrong saw Richard and noted in the chart that he became verbally aggressive towards a deputy, spitting and threatening to hurt him. Richard repeatedly said to Armstrong and Kendra Machetlen (Conmed's Health Services Administrator), "I want to lick you." Armstrong's assessment note said Richard was "re-directed" and that he would continue to be monitored on a racked watch. Armstrong said there should be documentation reflecting each of her daily rounds, and she cannot explain why the Conmed defendants have been unable to produce the records of those rounds. Despite this lack of documentation, the court concludes plaintiff has failed to cite evidence creating a genuine issue of fact as to whether Armstrong frequently checked on Richard during her rounds. Against her uncontradicted and at least partially corroborated testimony that she frequently made these rounds, the mere fact that defendants are unable to produce these records does not

create a genuine issue of fact as to whether the visits actually occurred.

Richard's medical and mental health history were known to Conmed and to Murphy. For privacy reasons and because of federal HIPPA law, jail deputies did not have access to Richard's medical and mental health records. Based on information in the "ILEADS" computer program, deputies would have generally known that Richard's medical and mental health care was being provided by Conmed and the clinic. That information would have shown that Richard was on a racked watch, that he was being regularly offered medications, and that he was frequently taken to the clinic. Some deputies would have been present and seen when members of the mental health unit conducted visits at Richard's cell. The fact that Richard was mentally ill would have been known to any of the deputies who had any regular contact with him.

In 2007 and 2008, jail deputies deferred to Conmed/clinic staff as to whether it was necessary or appropriate to administer emergency psychotropic medication or to initiate legal proceedings for forced administration of long-term psychotropic medications.

Sheriff's Department sergeants were required to review the deputy daily activity logs and to note the review in the log. Sergeants knew Richard was exhibiting bizarre behavior and was at times threatening deputies. It was also known that Richard's behavior was angering some of the other inmates. At times other inmates verbally taunted and abused Richard. Plaintiff cites evidence that some deputies allowed this and did nothing about it. Other deputies made some efforts to discourage such acts. A deputy log for January 2, 2008, for example, reflects that inmates in the pod were warned by the deputy they would

be locked down if they continued "to converse, torment, or try to get inmate Richard's attention...." On February 1, 2008, an entry indicated two pod workers (inmates) had been going to Richard's door and taunting him, trying to get him riled up. The pod deputy twice asked them to stop, after which they both returned to their own cells. Plaintiff cites evidence that correctional staff at times referred to mentally ill inmates as "mentals" or "retards" or in other derogatory terms.

F. <u>February 15, 2008 incident</u>.

During Richard's incarceration, Gary Steed was the elected sheriff of Sedgwick County. Robert Hinshaw was his undersheriff. Steed retired in December 2008. Hinshaw was then the sheriff from December 2008 to December 2012. Manuel Diaz and Saquisha Nelson were detention deputies employed by the Sheriff's department.

On February 15, 2008, Diaz served as the second-shift deputy for pod 7, where Richard was housed.

On the morning of February 15, 2008, a deputy logged that Richard appeared to be okay but he was talking very loudly and was banging on his door. In the afternoon, the deputy logged that Richard appeared to be okay but was talking loudly, tearing up toilet paper and making it into a pile and dancing around it. In the late afternoon, Diaz noted that Richard was urinating under his cell door but otherwise appeared all right. About an hour later Richard was observed standing on his bunk. He later completed a meal and was subsequently given toilet paper. Richard was in his cell talking to himself about 8:00 that evening.

At about 8:40 p.m., Diaz, Nelson, and Cassie Leu (Conmed

medication aide) went to Richard's cell to distribute medications. Diaz asked Richard if he would take his medications; Richard said he would. Diaz opened the cell door and Leu handed Richard his medications. Richard looked at the pills and became upset, telling Leu, "I want to take these three, bitch," rejecting some of the pills and cussing at Leu. Leu retreated to her medication cart outside the cell. Diaz stepped between Richard and Leu and warned Richard not to talk to staff like that. Leu and Diaz both testified that Richard grabbed Diaz's throat, but Nelson indicated she did not see any choking and thinks that Diaz pushed Richard back in the cell and told him to get back, after which Richard tried to push Diaz out of the way as if he wanted to get out of the cell.[9]

At that point Diaz began punching Richard in the face with a closed fist. Richard staggered back. Nelson's testimony indicates Diaz went into the cell and tried to take Richard to the ground but Richard was passively resisting and would not go down. Nelson hit her panic pager and went to assist Diaz. Diaz continued to punch Richard and took Richard to the ground. Nelson remembered Diaz telling Richard to "give her your arm" as Richard was on the ground and Diaz was continuing to punch him in the face. Nelson was on or over Richard trying to get the handcuffs on him. He did not offer up his arm so Nelson delivered a blow to his arm. At that point, according to Nelson, she looked up and saw that Richard appeared to be unconscious

---

[9] The parties have submitted very cryptic excerpts of Nelson's deposition. The portions provided indicate that Nelson testified she does not remember many of the details of the encounter, although she more or less vouched for the truth of a statement she gave to jail officials shortly after the incident. <u>See</u> Doc. 451-7 at p. 109.

and that there was blood everywhere. Despite this, Diaz continued to punch Richard in the face. Nelson "dazed off for a moment" [according to her own report] as she came to grips with what was occurring. She saw Diaz repeatedly strike Richard in the face with a closed fist before she "came back to reality" and heard inmate voices at the cell door. Inmates had gathered there and were agitated, with one calling out, "he['s] beating the shit out of that old man!" Nelson told Diaz to stop, but Diaz "looked as if he was totally out of it" and hit Richard in the face two or three more times before he stopped. Diaz and Nelson then handcuffed Richard and picked him up off the ground to take him to the booking area. Richard was still unconscious, however, so they placed him back on the floor. Diaz instructed Nelson to "rack the pod" – meaning to put the fifty or so inmates in the pod back in their cells – as a team of officers arrived in response to Nelson's panic signal. The team arrived approximately 44 seconds after the initial pager signal.

Diaz was 26 years old at the time of the incident. He was about 5 feet 9 inches tall and weighed about 220 pounds. Nelson was 19 years old. She was about 5 feet 2 inches tall and weighed about 108 pounds. Richard was 59 years old, approximately 5 feet 8 inches tall, and weighed around 150 pounds.

Nelson later estimated that Diaz hit Richard 15-16 times in the face with his fist. Leu estimated that Diaz punched Richard 20 times as hard as he could, and said she could hear bones breaking as Diaz hit Richard in the face. When Diaz stopped beating Richard, pools of blood had accumulated and Richard was unconscious with a severely swollen and misshaped jaw. Teeth were seen floating in the blood.

Richard was taken to Via Christi hospital with a fractured jaw and an "airway compromise" (respiratory failure). William Novak, a nurse practitioner with experience treating trauma injuries, testified this was one of the worst cases of head trauma from a beating he had ever seen.

G. Investigation and Aftermath.

Before any photographs were taken as evidence, Lt. Linzy had Diaz clean up and change out of his bloody uniform. Diaz had lost control of his bladder during the incident. No physical evidence from the incident was preserved.

After the incident pod worker Tommy Anderson told investigators that earlier in the evening he and another inmate had talked to Diaz about Richard keeping them up all night and told Diaz that Richard was throwing wet toilet paper at them. They jokingly told Diaz he ought to let them go in and "beat his [Richard's] ass," but Diaz said [according to Anderson], "Naw. Plus I don't like paperwork, you know I'm gonna do it myself. I'm gonna make it worthwhile."

Nelson was interviewed three times after the incident. A detective told Nelson there was a mark on Diaz's neck like the kind they see in domestic violence cases "when somebody grabs somebody like that." She believed the detectives were mad at her for not backing Diaz's version of events. A draft report of the Professional Standards Unit (PSU) included a comment that Nelson's "hesitation and her lack of tenacity greatly added to the situation and a timely and aggressive response by her may have lowered the amount of force Deputy Diaz felt he needed to use to control Richard." The PSU final report on April 14, 2008, ultimately found no violations by Diaz, concluding the

complaints against him for allegedly violating the Sheriff's use-of-force policies and for committing an aggravated battery were "not sustained."

Richard was hospitalized under guard at Via Christi hospital after the incident. He suffered hypoxia, nausea, vomiting, and respiratory failure, and he developed pneumonia with a MRSA (drug-resistant bacteria) infection. He suffered complete left vocal cord paralysis and partial damage to his right vocal cord, which required speech therapy

When Richard's public defender attempted to see him at Via Christi, she was initially turned away by a detention deputy. She then obtained a court order. After being made to wait outside Richard's door for several minutes, she was allowed to enter by a sheriff's deputy. When she did so she saw that a sheet on top of Richard had been partially moved aside to expose his genitals. Richard was either unconscious or semi-conscious at the time. The attorney concluded that the deputy had purposely moved the sheet aside. While Richard was in the hospital, someone also took photographs of him showing him laying in his own feces. No explanation is offered for the taking of these photos.

Richard was dismissed from Via Christi on May 25, 2008, and was transferred back to the jail. He was housed in the jail clinic from May 25 to June 19, 2008, for his safety. The clinic cells there often smelled of urine and feces. Plaintiff points out that nude photographs were also taken of Richard while he was in the clinic. Again, defendants offer no explanation or justification for the taking of these photos.

On June 18, 2008, Richard was transferred to the Wichita Nursing Center. A physician there recorded that Richard was post traumatic brain injury with resultant dysphasia and cognitive decline. Richard remained there until he died on February 1, 2010.

On July 21, 2008, Diaz was criminally charged in Sedgwick County District Court with recklessly causing great bodily harm or disfigurement to Richard (i.e., aggravated battery). He pleaded no contest on April 1, 2009, and was found guilty. On April 17, 2009, the PSU issued a revised report finding Diaz had violated the use-of-force policy and the law.

H. Sheriffs' policies; training; supervision of Diaz.

Steed and Hinshaw did not have access to Richard's medical records. They did have access to jail logs, which documented Richard's bizarre behavior, although plaintiff cites no evidence that Steed or Hinshaw ever actually saw the logs or that Richard's bizarre behavior was ever brought to their attention before the February 15th incident.

The sheriff organized supervision of deputies and staff along a chain of command. The chain of command in 2007-08 is described in General Order 101.01 in Exhibit D to the declaration of Maj. Glenn Kurtz. Under this policy there are several levels of supervision between the sheriff and a detention deputy. The sheriff was the final policy-maker for operation of the jail, including the training and supervising of detention deputies and the treatment of inmates. Between 2007 and December 2008, Steed was the final policy-maker.

Richard was in the jail pursuant to a Sedgwick County District Court order. The sheriff was statutorily obligated to comply with the court's order and, absent an emergency, was not authorized to transfer

-30-

Richard to a non-correctional setting without a court order. Transfer to a psychiatric hospital generally would have required a court order. The jail's policy on mental health care provided that if an individual could not be treated within the facility, arrangements would be made to provide appropriate care.

Sheriff's written policies in 2007-08 prohibited allowing inmates to be subjected to dangerous, unsafe and unsanitary conditions, and prohibited harassment of inmates. Deputies were generally trained and supervised to comply with the sheriff's policies. In the opinions of Steed and Hinshaw, these policies were consistent with similar policies used in similar jails.

Placement of an inmate on racked watch was addressed by written policy. General Order 115.04 provided in part that "[m]edical or special needs due to a disability will continue to be approved and set by lieutenants and sergeants in coordination with medical staff as appropriate ...." It provided that "[a] lieutenant may establish immediate management conditions on an inmate if they conclude there is a necessity to sustain safety or security concerns. This action will be followed up with a report by the lieutenant and remains subject to approval or modification by a division commander within a reasonable period of time." Steed and Hinshaw opined that in jails across the country, inmates acting like Richard are routinely placed on racked watch or under special management conditions.

Under General Orders 117 and 118, the jail's written policy provided that each inmate would be provided medical care from the time of admission throughout incarceration, with the operation of the medical staff under the direction of the contracted medical service

and administered by the administrative lieutenant. The policy provided that all operations were to be consistent with accepted medical policies and procedures within a detention setting. It stated that the problems of inmates with mental issues must be addressed in a professional manner with medical care provided to reduce the potential of a crisis.

Absent exceptional circumstances, deputies were not expected to provide medical care to inmates. The jail's practice was to rely on clinic staff to make decisions about medical care. Steed and Hinshaw opined it is normal practice for jailers to rely on medical professionals to make decisions concerning medical treatment, including for mental health treatment and forced administration of medications.

In 2007 and 2008, deputies at the jail were expected to rely on common sense when responding to an inmate request or a known need for medical attention and in determining whether it was necessary to direct an inmate to put their name on sick call, to contact a supervisor, or to issue a "Code 1" emergency. Plaintiff cites evidence that deputies were generally not to contact Conmed directly, but were directed to inform their supervisors about inmate health problems, and the supervisor would then contact Conmed.

Plaintiff cites evidence that Conmed's contract with Sedgwick County required Conmed to provide mental health services consistent with American Correctional Association (ACA) standards contained in Performance Based Standards for Adult Local Detention Facilities, 4th edition. Those standards provided, among other things, that mental health services would include, at a minimum, crisis intervention and

the management of acute psychiatric episodes, and stabilization of the mentally ill and the prevention of psychiatric deterioration in the correctional setting.

Prior to October 2007, Steed and Hinshaw made some efforts (the record does not disclose what) to acquire funding for a separate mental health pod in the jail. If funding had been provided, the Sedgwick County jail would have been the only county detention facility in Kansas with a such mental health unit.

The State of Kansas has no statutes that govern training of detention deputies. In 2007-08, the Sedgwick County Sheriff required candidates to pass a background investigation and complete 11 weeks of formal academy training to become a detention deputy. This was followed by 6 weeks of field training before deputies could work on their own. New detention deputies had to complete 22 hours of instruction regarding supervision of inmates. Covered topics included interpersonal communication skills and suicide prevention.

Diaz attended the academy between January 10 and March 23, 2005. The topics included review of sheriff's policies, interpersonal communication skills used in dealing with inmates, and the use of force. He also attended training after his graduation relating to updated sheriff's policies and a review of existing policies. Defendants have been unable to produce the materials or outline used for Diaz's 2005 academy class, although they have cited other evidence of what the training included. Plaintiff cites evidence that the Sedgwick County Sheriff's Department did not begin sending deputies to Crisis Intervention Training (CIT) until 2009 or 2010. That course was designed to provide education about mental illness and about how

to deal with mentally ill individuals in crisis.

The sheriff had a written policy, General Order 1.3, on the use of force. It provided that department personnel could use the amount of force reasonably necessary to affect a lawful objective, including to detain an offender, make an arrest, and maintain custody; to overcome resistance; to gain entry in a lawful manner; or protect the deputy or others. The policy prohibited excessive and indiscriminate use of force. Deputies received training on the policy and the use of force.

Diaz received some training on, and was familiar with, the Sheriff's policy that problems of arrestees with mental illness should be addressed in a professional manner. He said he had received some vague training at the academy about dealing with mentally ill persons, such as "don't escalate them and be respectful." Diaz received training on the use of force against inmates, including training on the "force continuum," which allowed a deputy to use just the force needed to gain control of an inmate.

The sheriff also had written policies against deputies committing any crime, discriminating or degrading any person on the basis of physical handicap or personal prejudice, or ridiculing or belittling any person.

Diaz testified that he was trained on and understood the sheriff's policies prohibiting the use of excessive force, prohibiting use of abusive or profane language towards inmates, and requiring that inmates be provided safe and humane treatment.

Deputies were subject to annual performance reviews by their supervising sergeant. Diaz was evaluated on January 1, 2008, by Sgt.

Brown. The review was generally positive and his overall rating was "satisfactory." The review noted two problem areas - absenteeism and use of foul language toward inmates.

The sheriff had a written policy providing that supervisors were to investigate any potential violation of policy or law by deputies. Serious allegations were to be referred to the Professional Standards Unit (PSU). The policy stated that supervisors were to take appropriate disciplinary action.

In 2007-08, the sheriff had established policies for reviewing use of force incidents. These included a requirement that use of force be reported; that the PSU review each use of force form, with appropriate follow-up investigation; and separate administrative review when a deputy was involved in a given number of incidents over time.

On March 9, 2007, Diaz was subject to an administrative review based on his involvement in seven use of force incidents over the preceding six months. The PSU reviewed each incident and determined that Diaz acted appropriately and in accordance with his training and the sheriff's policies in each instance. The report noted that several of the incidents involved Diaz helping to put an inmate in a restraint chair. The report's conclusion stated that Diaz needs to continue to be conscious of the use of force policy. The report's author, Lt. Evans, recommended that "Diaz's actions be monitored," and Captain Maxwell concurred in the recommendation.

Diaz was subject to a second administrative review on October 16, 2007, based on his involvement in seven use of force incidents since January 1, 2007. This review determined, with one exception, that

Diaz's actions were consistent with his training and sheriff's policies. The one exception occurred on June 5, 2007, after Diaz directed an inmate to take off his shoes for booking. The inmate threw his shoe at Diaz, striking him in the leg. Diaz struck the inmate with a fist and then took him to the floor and applied handcuffs. The review determined that Diaz's action in using a closed fist strike as a distraction technique was not consistent with training and policy. Instead, it said, he should have used another technique such as an ear slap, palm heel strike, or elbow strike. This review, like the prior one, asserted that Diaz's involvement in the incidents was "nothing more than coincidental situations as a result of his duty position at the time." The report's recommendation from Lt. Linzy was that "Diaz receive a personal refresher from a DTI [Defense Tactics Instructor] in distraction techniques and his actions be monitored."

Sgt. Brown testified that sergeants did not have access to excessive force investigation reports by the PSU. Brown was not aware of the administrative review of October 16, 2007, in which Lt. Linzy recommended that Diaz receive a refresher on distraction techniques and that his actions thereafter be monitored. Plaintiff cites some evidence that Diaz was not required to take a refresher course and that there was no particular monitoring of him after either of the foregoing administrative reviews.

The Sedgwick County defendants cite an affidavit of Maj. Kurtz asserting that deputies were subject to discipline for failing to address an inmate's request for medical attention, failing to allow an inmate to place his name on sick call, or failing to contact a supervisor or the clinic as appropriate if the deputy recognized the

need for medical attention. The affidavit cites no instance of a deputy ever having been so disciplined.

I. Opinions of Plaintiff's Experts.[10]

Plaintiff's expert witness Stuart Grassian, M.D., a board-certified psychiatrist, is of the opinion that Richard's mental health condition deteriorated during his 103 days of racked watch. Dr. Grassian's lengthy and wide-ranging report extensively criticizes the defendants' care and treatment of Richard. Among other things, he faults Dr. Murphy for placing Richard in segregation and for allegedly ignoring information that showed Richard's deterioration. He faults Conmed, Dr. Murphy and sheriffs Steed and Hinshaw for failing to educate staff about mental illness and for tolerating an "open and notorious practice" of ridiculing the mentally ill. Without such education, he believes, "there will likely be fear, and contempt, for the severely mentally ill patient" and "an inexorable tendency towards a fearful, contemptuous, ultimately sadistic approach to the mentally ill." He faults Conmed for failing to provide Dr. Murphy training on care of mentally ill individuals in a correctional setting, including the appropriate response to medication refusal and the procedure for medicating patients who lacked capacity to make decisions about their own need for treatment. He faults Dr. Murphy for not knowing the extent of his authority and for not making an effort to learn the

---

[10] The experts' opinions were covered in detail in the court's memorandum and order of December 17, 2013, following Daubert hearings (Doc. 487). In addition to the limitations placed on the experts' opinions in Doc. 487, the scope of their opinions is further limited by this order. Plaintiff's counsel are directed to furnish both Doc. 487 and this order to the experts and are responsible for ensuring that the experts confine their testimony accordingly.

relevant procedures or to seek help with them.[11] He notes that Dr. Murphy's contract only required him to work at the facility four hours per week, which Grassian says was inadequate to provide the psychiatric services required. He also faults Dr. Murphy for not talking to Richard and otherwise engaging in a proper evaluation of him.

Kathryn A. Burns, M.D., is a board-certified psychiatrist with training and experience in providing mental health services in a correctional setting. Her opinions include: Richard had a serious medical need (schizoaffective disorder); this need was well known to Conmed and jail staff at the time of his incarceration; Richard deteriorated under segregation; detention staff were not provided any training about how to deal with mentally ill inmates; neither the sheriffs nor Conmed established a system for handling mentally ill

---

[11]It is apparent from Dr. Grassian's report and deposition that he is not familiar with Kansas law dealing with transfer of an incarcerated individual from a detention facility to a medical facility for treatment. His opinion relies upon the testimony of a local probate judge whose deposition was taken in this case. Based on that testimony Dr. Grassian concludes that Dr. Murphy or Conmed "simply needed to order that [Richard] be transferred for evaluation to a psychiatric hospital" where a care and treatment petition could be filed. Aside from the lack of foundation for such an opinion, it does not mention or take into account K.S.A. § 59-2983 of the Care and Treatment Act, which provides that nothing in the Act shall apply to a mentally ill person in custody on a criminal charge, "except with the consent of either the prosecuting attorney or trial court." On the other hand, Dr. Grassian accurately points out that the jail itself had a policy providing that "arrangements would be made" to transfer an inmate if appropriate care could not be provided within the facility.

It is also unclear from Dr. Grassian's report whether he considered case law establishing the constitutional right of an inmate or detainee to avoid involuntary administration of antipsychotic drugs – "an interest that only an essential or overriding state interest might overcome." See Sell v. United States, 539 U.S. 166, 178-79 (2003). That right is not mentioned or discussed in his report.

inmates that complied with acceptable standards of correctional health care; acceptable standards of correctional health care required more frequent monitoring and contact with inmates in segregation and treatment of worsening symptoms, which neither Conmed nor Dr. Murphy provided; Conmed staff did not appropriately monitor Richard and failed to intervene when it was clear he was deteriorating; Dr. Murphy failed to address the issue of Richard's medication refusal, failed to speak to Richard or check on him, failed to ensure that mental health staff were checking on Richard, and failed to initiate any measures to have Richard transferred; Dr. Murphy failed to monitor PA Hall's work; Hall documented Richard's worsening condition in December but failed to treat it through psychiatric consultation, involuntary treatment, or psychiatric hospitalization; the sheriff failed to train, supervise, and monitor detention officers; the failure to treat Richard's condition and housing him in segregation made his condition worse and led to him being at risk for the beating by Diaz; the failure to train, supervise or monitor Diaz ultimately contributed to Richard's beating on February 15; and the sheriff was aware of the risk of harm from the foregoing failures and did nothing to ameliorate that risk.

Dr. Burns conceded she is not familiar with the state hospitals in Kansas (Osawatomie and Larned), the time frame for transferring inmates there, the criteria for transferring an inmate to Osawatomie, or the security level at Larned. Burns conceded that PA Hall was not responsible for making a decision about transferring Richard, but she said he had a duty to provide input because he was the only one at the jail full-time.

Ken Katsaris is a former police officer and sheriff with extensive experience in law enforcement and corrections. His opinions include: that the level of force used by Diaz on February 15 was inconsistent with Sedgwick County jail and other similar standards, in that Diaz unnecessarily chose to engage Richard at a high level of force; that Nelson's use of force (an arm strike to Richard) was unnecessary, as she was "required to attempt to get Diaz to disengage, not apply more force"; that the proper procedure would have been for Diaz and Nelson to use palm strikes if necessary to disengage from Richard, and then exit Richard's cell, lock the door and call for assistance rather than enter the cell; that the failure to ensure that Diaz received retraining and counseling following his prior use-of-force reviews was tantamount to ratification and posed a serious risk of harm to inmates such as Richard, and was the moving force behind the February 15 incident; that it is "inconceivable" that sheriffs Hinshaw and Steed were not aware of Diaz's prior aggressive behavior and reputation for using force; that the need for training of detention deputies about safely housing mentally ill inmates was obvious and was contemplated by recognized correctional standards; and the conditions of Richard's confinement were inhumane and below accepted correctional standards of care.

## III. Summary Judgment Standards.

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here. Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim. <u>Adamson v. Multi Community Diversified Svcs., Inc</u>., 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If so, the court cannot grant summary judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this determination, the court must view the facts in the light most favorable to the non-moving party and must resolve all factual disputes and reasonable inferences in favor of the non-moving party. See <u>Tabor v. Hilti, Inc.</u>, 703 F.3d 1206, 1215 (10th Cir. 2013).

**IV. Analysis.**

### A. <u>Dr. Paul Murphy</u>.

Plaintiff claims that Dr. Murphy deprived him of constitutional rights in violation of 42 U.S.C. § 1983 by being deliberately indifferent to Richard's serious medical needs; by failing to properly supervise Conmed employees and jail staff; by failing to properly train Conmed employees and jail staff; by subjecting Richard to unconstitutional conditions of confinement; and by failing to protect

Richard from physical and verbal abuse by inmates and deputies. Plaintiff also asserts the tort of outrage (intentional infliction of emotional distress) against Murphy.

1. Deliberate indifference to serious medical needs.

a. Legal standard. To prevail on a claim under § 1983, a plaintiff must show the deprivation of a right secured by the Constitution and laws of the United States committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). It is undisputed here that all of the defendants were acting under color of state law at all relevant times. Plaintiff's first claim is that Dr. Murphy deprived Richard of the constitutional right to adequate medical care while Richard was a detainee in the jail.

Under the Fourteenth Amendment due process clause, pretrial detainees are entitled to the same degree of protection against denial of medical attention as are inmates under the Eighth Amendment. Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009). A jail official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official exhibits deliberate indifference to an inmate's serious medical needs. Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005).

Deliberate indifference encompasses two components. Mata, 427 F.3d at 751 (citing Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000)). First, there is an objective component, which requires proof that the detainee's medical need was sufficiently serious.

> We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

> attention." <u>Sealock</u>, 218 F.3d at 1209 (quoting
> <u>Hunt v. Uphoff</u>, 199 F.3d 1220, 1224 (10th
> Cir.1999)[]. Where the necessity for treatment
> would not be obvious to a lay person, the medical
> judgment of the physician, even if grossly
> negligent, is not subject to second-guessing in
> the guise of an Eighth Amendment claim. See,
> e.g., <u>Green v. Branson</u>, 108 F.3d 1296, 1303 (10th
> Cir. 1997). Moreover, a delay in medical care
> "only constitutes an Eighth Amendment violation
> where the plaintiff can show the delay resulted
> in substantial harm." <u>Oxendine v. Kaplan</u>, 241
> F.3d 1272, 1276 (10th Cir. 2001) (quotation
> omitted). The substantial harm requirement "may
> be satisfied by lifelong handicap, permanent
> loss, or considerable pain." <u>Garrett v. Stratman</u>,
> 254 F.3d 946, 950 (10th Cir. 2001).

<u>Mata</u>, 427 F.3d at 751.

The second part of the deliberate indifference test involves a subjective component. It requires the plaintiff to present evidence of the defendant's culpable state of mind. <u>Mata</u>, 427 F.3d at 751 (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).

> The subjective component is satisfied if the
> official "knows of and disregards an excessive
> risk to inmate health or safety; the official
> must both be aware of facts from which the
> inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the
> inference."

<u>Mata</u>, 427 F.3d at 751 (citing <u>Estelle</u>, 429 U.S. at 104-105)). The subjective component "is akin to 'recklessness in the criminal law'" in which the person must consciously disregard a substantial risk of serious harm. <u>Self</u>, 439 F.3d at 1231. It lies somewhere between the poles of negligence at the one end and purpose at the other. <u>Blackmon v. Sutton</u>, 734 F.3d 1237, 1245 (10th Cir. 2013) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 836 (1994)).

Case law recognizes at least two types of conduct as deliberate indifference. In the first, a medical professional may fail to treat

an inmate's serious medical condition properly. But "the medical judgment of [a] physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." <u>Mata</u>, 427 F.3d at 751. <u>Estelle</u>, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). A jail physician who exercises his considered medical judgment does not face liability under the subjective component "absent an extraordinary degree of neglect." <u>Self v. Crum</u>, 439 F.3d 1227, 1232 (10th Cir. 2006). "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." <u>Self</u>, 439 F.3d at 1233.

A second type of conduct qualifying as deliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment. <u>Sealock</u>, 218 F.3d at 1211. A medical professional will not ordinarily be liable for this type of indifference, because he or she is generally the person who provides the treatment. But if a medical professional or jail employee knows that his role is to serve as a gatekeeper for other medical personnel capable of treating the condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, he may be liable for denying access to medical care. <u>Sealock</u>, 218 F.3d at 1211; <u>Mata</u>, 427 F.3d at 751.

b. <u>Discussion</u>. Dr. Murphy does not dispute that Richard's schizoaffective disorder and resulting symptoms constituted a serious medical need within the meaning of the law. That concession is

appropriate given that Dr. Murphy approved of treatment for what was obviously a severe mental illness. Left untreated the condition caused both serious harm to Richard and a serious risk of physical harm to persons with whom Richard came into contact. <u>Cf</u>. <u>Stevens v. City of St. Louis</u>, 2012 WL 1906362, 11 (E.D.Mo., May 25, 2012) (untreated schizophrenia can in some instances constitute a serious medical need).

On this record a genuine issue of fact exists as to whether Dr. Murphy was deliberately indifferent to Richard's serious medical needs. Plaintiff cites evidence that Richard's severe mental illness was bad and grew increasingly worse at the jail. Richard experienced hallucinations and delusions and engaged in obviously bizarre behavior. His medication compliance decreased over time. Dr. Murphy admitted that he concluded "early on" in Richard's incarceration (i.e. by early December 2007) that Richard needed to be hospitalized for treatment of his psychotic condition. Yet he notified no one of that conclusion. Dr. Murphy correctly points out that he had no authority to order a transfer on his own, but he offers no explanation for not at least notifying jail officials of his conclusion. Jail officials had the ability to seek court approval for a transfer through appropriate channels. Cf. <u>Blackmon v. Sutton</u>, 734 F.3d 1237, 1246 (10th Cir. 2013) ("We can imagine easily enough situations in which a transfer might be necessary to ensure a pretrial detainee ... receives constitutionally guaranteed medical treatment.") The jail had a written policy that "arrangements would be made" when an inmate's medical needs could not be adequately addressed at the facility.

Dr. Murphy was in charge of treating Richard's mental illness,

and he was thus ultimately responsible for making jail officials aware of any serious mental health treatment needs that could not be met at the jail. Detention deputies and sheriff's officers could not have been expected to know that Richard's psychotic condition required psychiatric hospitalization rather than treatment at the jail. In this sense Dr. Murphy was a gatekeeper with a responsibility to relay information to ensure that Richard's serious medical needs were met. His unexplained failure to fulfill this role when he knew that hospitalization was required and that without hospitalization Richard would continue to suffer unnecessarily in a psychotic state could be found to satisfy both the objective and subjective components of deliberate indifference. Cf. <u>Rice ex rel. Rice v. Correctional Med. Svcs.</u>, 675 F.3d 650, 685 (7th Cir. 2012).

Dr. Murphy contends he made an attempt to get Richard transferred to a hospital by telling someone on the staff – he could not recall who – to contact the attorneys in Richard's case and ask them to request a competency evaluation. But as plaintiff points out, this assertion is genuinely controverted. Richard's public defender, who filed the competency motion, testified that no one ever contacted her with such a request. Moreover, as Richard sat in the jail week after week and continued to deteriorate, Dr. Murphy took no additional steps and did not follow up to see why Richard had not been transferred. Dr. Murphy was clearly aware that Richard remained in the jail after this alleged attempt at a transfer. He was also aware that Richard continued to deteriorate and that he spent a good deal of the time in a psychotic condition. A jury could find that Richard needlessly incurred both physical pain and serious psychological harm as a

result. To the extent Murphy failed to notify anyone of his conclusion that Richard needed hospitalization and failed to make any attempt to get him transferred, he was not "exercis[ing] his considered medical judgment." Cf. Self v. Crum, 439 F.3d 1227 (10th Cir. 2006). Nor was this an instance of a negligent or erroneous diagnosis. Dr. Murphy recognized the need for hospitalization early on and was aware (viewing the facts in plaintiff's favor) of a specific risk of serious harm to Richard from not being hospitalized. Yet he failed to do anything to address the need. A jury could view such an unexplained failure to act as evidence of deliberate indifference to Richard's serious medical needs.

In connection with this conclusion, defendants cite no evidence that Dr. Murphy ever evaluated Richard prior to the incident with Diaz on February 15 — a period of three and a half months. Nor is evidence cited that he ever spoke to Richard about his health during that period. It is not clear whether he gave any consideration to Dr. Coyner's October 31, 2007 certification that Richard was a danger to himself or others. Dr. Murphy was aware toward the end of 2007 that Richard was refusing medication and his condition was deteriorating as a result — a fact conveyed to him by Hall. And at some point Dr. Murphy spoke with Hall and concurred that a prn order for short-term injections was appropriate. But aside from this, Dr. Murphy took no further steps. As a result, Richard's ongoing need for psychiatric hospitalization — a need conceded and recognized by Dr. Murphy — was simply never addressed.

Dr. Murphy may well have had a good-faith belief that Richard had a constitutional right to refuse antipsychotic medications. See

_Washington v. Harper_, 494 U.S. 210 (1990) (mentally ill prisoner had liberty interest in refusing unwanted antipsychotic medication; interest may be overcome if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest). But that does not mean he could ignore Richard's medication refusals and the resulting state of Richard's health. On prior occasions Dr. Murphy acted to get Richard civilly committed to a state hospital when he could not be stabilized with in-patient treatment at Good Shepherd. Dr. Murphy likewise concluded that Richard needed psychiatric hospitalization in this instance. Assuming the doctor was correct that he could not initiate a civil petition for care and treatment because Richard was in custody on a criminal charge,[12] he was still responsible for seeing that Richard's basic health care needs were met, and at that point he had a duty to advise jail or court officials of his opinion that psychiatric hospitalization was medically necessary. There is no explanation in the record for why he did not do so. Given the jail's policy of making other arrangements when adequate treatment could not be provided in the jail, a jury could find that a recommendation from Dr. Murphy likely would have resulted in Richard's transfer to a hospital and would have prevented Richard from enduring needless pain and suffering.

The court also notes plaintiff's evidence that the standard of care required Dr. Murphy to take steps to address Richard's medication

---

[12] As noted previously, the Kansas Care and Treatment Act does not apply to a person in custody on a criminal charge "except with the consent of either the prosecuting attorney or trial court." K.S.A. § 59-2983. Plaintiff cites no contrary law or evidence of an established practice in Kansas relating to psychiatric hospitalization of mentally ill jail detainees.

refusal, including the elemental step of talking to him and conveying the importance of taking his medication. Insofar as the record reveals, Dr. Murphy did not speak to Richard about his medication in the three and half months leading up to February 15, 2008. Viewed in a light most favorable to plaintiff, this failure was part of a pattern of neglect, culminating in the failure to address Richard's need for hospitalization, from which a jury could infer Dr. Murphy's deliberate indifference to Richard's serious medical needs. <u>Cf</u>. <u>Rice</u>, 675 F.3d at 686 (no deliberate indifference where doctor visited patient regularly, monitored his condition between visits, prescribed psychotropic medication, and petitioned for inmate's commitment to inpatient facilities on three separate occasions). Summary judgment on this claim is accordingly denied.

2. <u>Failure to Supervise or Train</u>.

Plaintiff contends Dr. Murphy is liable under § 1983 for failing to properly supervise and train Conmed employees and correctional staff. In the pretrial order, plaintiff alleges:

> The acts of Dr. Murphy's subordinates Mike Hall, P.A., and Conmed providers Barnt, Skelton, Armstrong & Machetlen deprived [Richard] of his rights to care for his serious mental health needs. Dr. Murphy directed said subordinates in the acts that deprived [Richard] of these rights and set in motion a series of acts by his subordinates, or knew, or reasonably should have known the acts would cause the subordinates to deprive [Richard] of his rights.

Doc. 422 at 33.

Such "supervisory liability" claims have been recognized in the Tenth Circuit, although the scope of such claims is not entirely clear. In <u>Dodds v. Richardson</u>, 614 F.3d 1185, 1199 (10th Cir. 2010),

the court said a plaintiff could prevail on such a claim by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. More recently, the Tenth Circuit reiterated that individual liability under § 1983 must be based on a defendant's personal involvement in the alleged constitutional violation. See Schneider v. City of Grand Junction Police Dept., 717 F.3d 760, 768 (10th Cir. 2013). Because vicarious liability does not apply to § 1983 suits, a plaintiff must show that the defendant, "through the defendant's own individual actions, has violated the constitution." Schenider, 717 F.3d at 768.

Plaintiff's ill-defined supervisor claims suffer from a number of deficiencies, beginning with plaintiff's failure to point to evidence of Dr. Murphy's supervisory authority over jail staff. Plaintiff merely points to vague language in Murphy's contract with Conmed stating that Murphy agreed to "provide consultation and guidance to medical and correction staff" relating to inmates with mental illness. A duty to consult with and provide guidance to others does not establish a supervisory relationship, let alone a responsibility (or authority) to train those persons. Plaintiff also fails to articulate how Dr. Murphy's supervisory actions or failures over Conmed employees was linked to or caused any violation of Richard's constitutional rights. And with respect to the requisite state of mind, plaintiff utterly fails, despite page after page of allegations, to cite any evidence establishing that Dr. Murphy was

deliberately indifferent to an obvious risk of constitutional harm arising from some particular lack of supervision or training of mental health unit members or jail staff. Dr. Murphy's motion for summary judgment is granted on this claim.

3. Conditions of confinement.

Plaintiff contends Dr. Murphy is liable for Richard being held in unconstitutional conditions of confinement because "Richard was held in a filthy cell [that was] filled with his own feces and urine" and Dr. Murphy "never inspected [the cells] and has no proof the conditions aren't as described." (Doc. 465 at 28).

Prison officials are required to insure that inmates receive adequate food, clothing, shelter and medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). A plaintiff claiming a violation of the right to adequate conditions of confinement must show conditions sufficient to "deprive inmates of the minimal civilized measure of life's necessities," or alternatively, a condition so serious as to constitute a substantial risk of serious harm. Shannon v. Graves, 257 F.3d 1164, 1168 (10th Cir. 2001). Courts have recognized that inmate exposure to sewage can constitute a serious risk to health, but the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered is assessing whether the condition is sufficiently serious to support a claim. Shannon, 257 F.3d at 1168. A plaintiff making a conditions of confinement claim must also satisfy a subjective component, by showing that the prison official acted or failed to act with deliberate indifference to the inmate's health or safety.

Plaintiff does not establish the frequency and duration of

Richard's exposure to urine or feces, or the jail's efforts to clean Richard's cell. More fundamentally, missing from plaintiff's claim is any evidence that Dr. Murphy was personally responsible for the conditions under which Richard was held in the jail. That failure alone is sufficient to warrant summary judgment on the claim. See e.g., <u>Lee v. Baker</u>,181 F.3d 101 (Table), 1999 WL 282652, *2 (6th Cir. 1999) ("Liability cannot be established absent a clear showing that the defendants were personally responsible for the circumstances forming the basis of the alleged unconstitutional conditions of confinement."). Additionally, insofar as plaintiff's claim is based on the <u>smell</u> of urine and feces – which plaintiff repeatedly mentions in the pretrial order – plaintiff cites no evidence of physical injury to Richard from this condition, which precludes the claim. See <u>Dickinson v. New Mexico Behavioral Health Institute</u>, 335 Fed.Appx. 729, 734, 2009 WL 1762187, 4 (10th Cir., June 23, 2009) (where plaintiff alleged unit was unsanitary and smelled of urine and feces, he could not recover compensatory damages absent proof of physical injury from the conditions); <u>cf</u>. <u>McBride v. Deer</u>, 240 F.3d 1287, 1292 (10th Cir. 2001). Dr. Murphy's motion for summary judgment is granted as to this claim.

    4. <u>Failure to Protect Richard's Safety</u>.

    In response to Dr. Murphy's motion for summary judgment on this claim, plaintiff alleges that Richard suffered abuse from other inmates, he cites general Eighth Amendment law, and then he simply argues that "[p]laintiff has sufficiently established genuine issues of material fact as to whether Dr. Murphy['s] conduct with regard to Richard's conditions of confinement demonstrates deliberate

indifference to [Richard's] health and safety." (Doc. 465 at 28-29).

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994). But it is unclear how plaintiff contends Dr. Murphy violated such a duty, particularly since the sheriff, not the jail psychiatrist, was responsible for jail security. <u>Green v. Branson</u>, 108 F.3d 1296, 1302 (10th Cir.1997) (a § 1983 plaintiff must "show that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.") Plaintiff cites some testimony that Richard was periodically taunted by other inmates in the jail. As deplorable as such verbal taunts may have been, under the record presented they do not rise to the level of a constitutional violation. <u>See</u> <u>McBride</u>, 240 F.3d at 1291, n.3 (10th Cir. 2001) ("[a]cts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment."). And plaintiff cites no specific <u>admissible</u> evidence that Richard was ever physically attacked by other inmates. More to the point, plaintiff cites no evidence of Dr. Murphy's responsibility for protecting Richard from attacks by other inmates or that he was somehow deliberately indifferent to such attacks. <u>See</u> <u>Verdecia v. Adams</u>, 327 F.3d 1171 (10th Cir. 2003) (failure to protect claim requires showing of deliberate indifference to inmate's safety); <u>Farmer</u>, 511 U.S. at 837 (the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference). Dr. Murphy's motion for summary judgment is granted on this claim.

5. <u>Tort of outrage</u>.

Plaintiff also asserts a claim against Dr. Murphy for the tort of outrage. Under Kansas law, the tort of outrage has four elements: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. <u>Miller v. Sloan, Listrom, Eisnbarth, Sloan and Glassman</u>, 267 Kan. 245, 257, 978 P.2d 922 (1999). The conduct must be "so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." <u>Miller</u>, 267 Kan. at 257. The tort of outrage is the same as the tort of intentional infliction of emotional distress. <u>Valadez v. Emmis Communications</u>, 290 Kan. 472, 476, 229 P.3d 389 (2010).

Under Kansas law, the court must determine whether two thresholds are met: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by the plaintiff was of such extreme degree the law must intervene because the distress inflicted was so severe that no reasonable person should be expected to endure it. <u>Valadez</u>, 290 Kan. at 477.

Although the court has concluded that Dr. Murphy's failure and omission to seek hospitalization of Richard creates a genuine issue of fact on the claim that he was deliberately indifferent to Richard's medical needs, the court cannot go further and say that same evidence would allow a finding that he acted "beyond the bounds of decency" and

-54-

in such an extreme manner as "to be regarded as atrocious and utterly intolerable in a civilized society." While a jury could reasonably find the doctor's failure to take action in the face of a known risk entitles Richard to damages, the alleged conduct is not of a character that would lead an average citizen upon hearing the facts "to spontaneously exclaim, 'Outrageous!' <u>Fusaro v. First Family Mtg. Corp., Inc.</u>, 257 Kan. 794, 897 P.2d 123 (1992). The court notes that in support of the outrage claim plaintiff apparently relies in part on the fact that two improper and degrading photographs of Richard were taken while he was in custody. Plaintiff cites no evidence, however, from which a jury could reasonably conclude that Dr. Murphy had anything to do with those photos. Under the circumstances, Dr. Murphy's motion for summary judgment on this claim will be granted.

## B. **Mike S. Hall, P.A.**

Plaintiff claims Hall is liable under §1983 under for deliberate indifference to Richard's serious medical needs and failure to protect Richard's safety, and also that he is liable for the Kansas tort of outrage.

1. <u>Deliberate indifference to medical needs</u>.

Hall contends the evidence will not support a finding of deliberate indifference. He lists the actions that he took to treat Richard and argues they negate any such claim. In response, plaintiff lists various things that Hall allegedly failed to do, such as reading the deputies' daily activity logs, moving Richard "out of the abusive environment," moving Richard to a clinic cell, administering involuntary psychotropic injections, and transferring Richard to an outside facility. (Doc. 468 at 24-25). Plaintiff also asserts that

Hall was a gatekeeper and argues that he failed to fulfill that role because he "let those conditions arise" that resulted in harm to Richard.

As Hall points out, he took numerous steps to treat Richard's mental illness, including prescribing appropriate antipsychotic medication, seeing and evaluating Richard on at least two occasions, and adjusting Richard's medication in light of his symptoms. The record also shows that Hall monitored Richard's behavior and medication and communicated with health care workers who saw Richard on a regular basis. When Richard began refusing medication more often, Hall directed a nurse or social worker to check on him to see if he would take his medication. The uncontroverted facts show that Hall consulted both with Dr. Murphy and Dr. McNeil about Richard's treatment. After doing so, Hall authorized short-term prn injections in the event that Richard became an acute danger to himself or others.

Plaintiff's evidence provides no basis on which a jury could reasonably find that Hall was deliberately indifferent to Richard's serious medical needs. Plaintiff complains that Hall did not adequately monitor Richard, but such a general claim is insufficient. Stevens v. City of St. Louis, 2012 WL 1906362, *12 (E.D. Mo. May 25, 2012) ("The general assertion that jail officials should have monitored a mentally ill or potentially mentally ill inmate more closely is insufficient to prove a constitutional violation."). It is always possible – particularly with hindsight – to say a particular inmate should have monitored more closely. But plaintiff fails to cite any relevant information that greater monitoring would have uncovered and has failed to show it would have made any difference in Richard's

treatment. Similarly, notwithstanding plaintiff's vague complaint about Hall's failure to fulfill his gatekeeping role, the evidence shows that Hall kept Dr. Murphy appraised of the material facts relating to Richard's condition, including the fact that he was refusing his medication and that his psychotic behavior was increasing.

Plaintiff complains that Hall failed to get Richard transferred to another cell or facility. Even plaintiff's own experts concede it was Dr. Murphy, not Hall, who had responsibility with respect to getting Richard moved or transferred for appropriate medical treatment.[13] And as stated above, the record shows that Hall conveyed the material facts concerning Richard's condition to Dr. Murphy, who was Hall's supervising physician. Plaintiff's experts are also critical of the fact that Richard was placed in a segregation cell, something they argue is contrary to proper medical procedure. But even if it was, it in no way rises to the level of deliberate indifference. Cf. Amick v. Ohio Dept. of Rehabilitation & Correction, 521 Fed.Appx. 354, 359, 2013 WL 1223570 (6th Cir. 2013)(directive to place inmate with schizoaffective disorder in a cell by himself was reasonably calculated to minimize the risk that his condition would expose him to harm at the hands of another inmate). Under the circumstances plaintiff has failed to show that Hall caused a deprivation of Richard's right to adequate treatment or was deliberately indifferent

_____

[13] This is but one of several examples of plaintiff's counsel's failure to follow the admonition of the court's September 9, 2013 letter and the rules pertaining to summary judgment. Surely counsel cannot believe that the court would allow this claim to go forward when it is torpedoed by plaintiff's experts.

to a risk of harm from not moving or transferring Richard.

Plaintiff next faults Hall for not evaluating Richard's competency to make treatment decisions. But the test for determining whether antipsychotic medication may be administered against the will of a jail detainee does not depend upon whether the detainee is competent to make treatment decisions. See Harper, 494 U.S. at 222. Plaintiff also makes the novel claim that Hall violated Richard's constitutional rights by not administering antipsychotc drugs against Richard's will. In doing so, plaintiff ignores the substantial body of case law establishing an inmate's constitutional liberty interest in refusing antipsychotic medication – as well as a multitude of lawsuits by inmates for alleged violation of that right. Under this case law, the state's interest in reducing the danger posed by a mentally ill inmate is a critical factor in determining whether forced administration of antipsychotic drugs in a detention facility is permissible. Harper, 494 U.S. at 225-26. Plaintiff's experts take it as a given that Richard was such a danger to himself or others that involuntary medication should have been administered. But the circumstances of Richard's incarceration, including his placement in segregation, greatly reduced the risk of physical altercations with others. Moreover, Richard never attempted to physically harm himself while he was in the jail. In the end, the judgment as to whether there was a sufficient risk of danger to warrant involuntary medication was part and parcel of a medical judgment made by Hall and ultimately Murphy. The record shows that Hall exercised his judgment – in conjunction with his supervising physician Dr. Murphy – and concluded that a prn authorization was warranted by Richard's signs of increased

agitation, but that Richard's behavior did not present such an acutely dangerous situation that administration of involuntary injections was required. His judgment may be subject to debate, but it clearly had some factual support. And such a medical judgment, "even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim." Mata, 427 F.3d at 751. Inasmuch as plaintiff has shown no genuine issue of material fact, Hall's motion for summary judgment on this claim is granted.

2. Failure to protect Richard's safety.

Plaintiff's response does not clearly identify any claim against Hall for failure to protect Richard's safety. (Doc. 468 at 24-26). The claim is presumably based allegations similar to those against Dr. Murphy, i.e., on Hall's alleged failure to do anything when Richard was being taunted by other inmates and "was living in filthy conditions." For the same reasons discussed with respect to the claim against Dr. Murphy, the court concludes plaintiff has failed to cite admissible evidence that Hall caused a deprivation of Richard's right to safety or that he was deliberately indifferent to a known risk to Richard's safety.[14]

3. Tort of Outrage.

Plaintiff's response brief asserts that "Plaintiff has sufficiently established genuine issues of material fact exist as to whether Hall['s] ... conduct with respect to Edgar Richard, Jr. could

---

[14] Plaintiff's briefs frequently say that Richard was "spit on, had his food sprayed with chemicals[,] and had hot water thrown in his face." Plaintiff's statements of fact and briefs, however, fail to point to any admissible evidence in the record establishing such facts or their connection to the claims against the various individual defendants.

be described as extreme and outrageous enough to subject [him] to liability for Richard's emotional distress and bodily harm that occurred as a result." (Doc. 468 at 29).

Under the standards of <u>Miller v. Sloan, Listrom, Eisnbarth, Sloan and Glassman</u>, 267 Kan. 245, 257, 978 P.2d 922 (1999) discussed previously, the court concludes plaintiff has failed to cite evidence that Hall's conduct was beyond the bounds of decency and utterly intolerable in a civilized society. Quite to the contrary, the facts show that Hall made efforts to treat Richard, he evaluated and monitored Richard, he prescribed appropriate medication, he adjusted Richard's medication in response to his symptoms, he made some effort to get Richard to take his medication, he consulted with his supervising physician, and he prescribed prn medication as a precautionary measure to protect Richard and others from harm. Whatever lapses or errors in judgment plaintiff believes Hall committed in the course of treating or failing to treat Richard, they fail to establish a viable claim for the tort of outrage.

In sum, Hall is entitled to summary judgment on all of plaintiff's claims against him.

### C. <u>Conmed Healthcare Management, Inc.</u>

Conmed Healthcare Management, Inc. (CHMI) states that Conmed, Inc. is its subsidiary. It argues plaintiff has only alleged unconstitutional acts of employees or contractors of Conmed, Inc., not of CHMI, and has identified no policies of CHMI that caused any constitutional deprivations. (Doc. 441 at 22-23).

Plaintiff's brief (Doc. 468) does not address this issue. Accordingly, the court considers the issue uncontested and grants

CHMI's motion for summary judgment.

### D. **Conmed, Inc.**

The pretrial order identifies the following claims against Conmed, Inc.: § 1983 claims for failure to supervise, failure to train, and municipal (corporate) liability under Monell v. Dept. of Social Services, 436 U.S. 658 (1978); the state law tort of outrage, and respondeat superior liability. Doc. 442 at 65-66.

1. §1983 claims.

a. Official policy or custom element. In Monell, the Supreme Court made clear that respondeat superior does not apply under § 1983, meaning a municipal corporation is not liable for a violation of constitutional rights by its employee merely because it employed the tortfeasor. Rather, a municipality is liable only when a constitutional deprivation results from an official policy or custom of the municipality. Monell, 436 U.S. at 691; Schneider v. City of Grand Junction Police Dept., 717 F.3d 760, 770 (10th Cir. 2013). This "official policy" requirement "was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality [itself] is actually responsible." Schneider, 717 F.3d at 770 (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986)). The Monell standard applies equally to private corporations acting under color of state law, but they too are liable only when the corporation's official policy or custom caused a deprivation of constitutional rights. Dubbs v. Head Start, Inc., 336 F.3d 1194, 1216 (10th Cir. 2003).

A challenged practice is considered an official policy or custom

if it is a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision. Schneider, 717 F.3d at 770.

b. Causation element. To establish the causation element on a Monell claim, the challenged policy or practice must be "closely related to the violation of the plaintiff's federally protected right." This requirement is met if plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." Schneider, 717 F.3d at 770 (quoting Bd. of County Commrs. of Bryan County, Okla. v. Brown, 520 U.S. 397, 404 (1997)). Where a plaintiff claims that the municipality has not directly inflicted an injury, but has caused an employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Schneider, 717 F.3d at 770 (quoting Brown, 520 U.S. at 405). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." Schneider, 717 F.3d at 770 (quoting Martin A. Schwartz, Section 1983 Litigation Claims & Defenses, §7.12).

c. State of mind element.

A § 1983 plaintiff must also demonstrate that the corporation acted with the requisite degree of culpability. Insofar as plaintiff claims a lack of training or supervision by Conmed caused employees or jail staff to violate Richard's right to adequate medical care, such a claim requires plaintiff to show that the failure of training or supervision was done "with deliberate indifference as to its known

-62-

or obvious consequences." Schneider, 717 F.3d at 770 (quoting Brown, 520 U.S. at 407). This is satisfied if Conmed had actual or constructive notice that its failure to train or supervise was substantially certain to result in a constitutional violation and it deliberately chose to disregard the risk of harm. A pattern of similar constitutional violations is ordinarily necessary to demonstrate such notice. Schneider, 717 F.3d at 771. Only in "a narrow range of circumstances" can deliberate indifference be found absent a pattern of violations. Proof of a pattern is not required if the violation was a "highly predictable" or "plainly obvious" consequence of the corporation's action or inaction, "such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998).

d. Discussion. Unfortunately, plaintiff's allegations against Condmed in the pretrial order are so convoluted and disjointed that they are difficult to comprehend, let alone analyze. (Doc. 422 at 27-32).[15]

_____

[15]For example, plaintiff alleges that Conmed created policies or customs through its agents, including Machetlen, Murphy, McNeil and Hall, which they knew or reasonably should have known would cause others to deprive inmates, including Richard, of "their constitutional rights (1),(3),(4),(7) & (9) as articulated on pages 17 and 18 [of the pretrial order]." This is followed by a one-and-a-half page list of eleven purported policies or customs of Conmed. Another lengthy paragraph alleges that Conmed, through Machetlen, Murphy, McNeil and Hall "failed to train and supervise their employees and the Sheriff and detention staff" with respect to eleven different recurring situations with which they must deal, with the same four individuals being deliberately indifferent to the obvious consequences of their failure to train and supervise, and when Hall, Barnt, Skelton, Armstrong and Machetlen "were deliberately indifferent to and violated

Conmed's motion for summary judgment argues the § 1983 claims should be dismissed for various reasons, including a failure by plaintiff to identify any employees with final decision-making authority for the multitude of policies alleged in the pretrial order; a failure to show supervision responsibilities of various employees; a failure to identify specific deficiencies in training that were closely related to the claimed injury; a failure to identify which employees violated Richard's rights with respect to the alleged policies or customs; a failure to prove underlying § 1983 violations by Conmed employees; a failure to show evidence of causation; and a failure to show evidence of deliberate indifference.

The court concludes that plaintiff's <u>Monell</u> claims fail on several levels, including a failure to show a genuine issue as to whether Conmed employees violated Richard's right to adequate medical care. Plaintiff's response brief first asserts that Hall was deliberately indifferent to Richard's medical needs. (Doc. 468 at 24-26). For the reasons previously discussed, plaintiff has failed to show a genuine issue on any such claim against Hall. Plaintiff next asserts in characteristic group fashion that "Skelton, Barnt, Armstrong & [Machetlen] were gatekeepers to other medical personnel" and "each, independently, denied, delayed access to, and interfered with Richard's necessary medical care." Such group allegations utterly fail to meet plaintiff's summary judgment burden of showing a genuine issue of fact whether actions or failures of these individual

[Richard's] constitutional rights (1),(3),(4),(7) & (9)," and when "said conduct was a moving force behind [Richard's] mental degeneration...." (Doc. 442 at 29-32).

employees deprived Richard of a constitutional right. See Pahls v. Thomas, 718 F.3d 1210, 1226 (10th Cir. 2013) ("When various officials have taken different actions with respect to a plaintiff, the plaintiff's facile, passive voice showing that his rights 'were violated' will not suffice. Likewise insufficient is a plaintiff's more active-voice yet undifferentiated contention that 'defendants' infringed his rights.").

Machetlen, insofar as the record discloses, was an administrator for Conmed and not a health care provider. Plaintiff's response brief identifies no conduct or particular failure on her part that deprived Richard of a constitutional right, nor does plaintiff cite any evidence of her deliberate indifference to a risk of harm to Richard. The same is true with respect to Skelton, Barnt and Armstrong. The specific failures identified in plaintiff's brief are an alleged failure to do daily checks, a failure to read the deputy logs, a failure to move Richard to a clinic cell, a failure to seek involuntary psychotropic injections, and a failure to have Richard transferred to an outside facility. (Doc. 468 at 26-27). These allegations (again leveled against the group without regard to individual involvement) fail to establish a claim for multiple reasons. Plaintiff first fails to show the personal participation of the individuals in any deprivation of Richard's rights. Beyond that, a failure to conduct daily checks or to read deputy logs is not shown to be causally linked to any deprivation of Richard's right to adequate treatment. It is uncontroverted that Dr. Murphy and Hall were aware of Richard's bizarre behavior, of his medication non-compliance, and of his deteriorating condition. The alleged failure of Armstrong,

Barnt and Skelton to relay such information to Murphy and Hall was, insofar as the record shows, immaterial to their ultimate treatment decisions and immaterial to the only potential violation plaintiff has shown thus far – Murphy's failure to do anything to seek hospitalization of Richard after concluding that Richard required it. The alleged failure of Armstrong, Barnt or Skelton to somehow affect Richard's movement to a different cell or facility likewise suffers from an absence of personal involvement and no showing that these employees were deliberately indifferent to a risk of harm to Richard. Cf. Brown, 520 U.S. at 405 ("In any § 1983 suit ... the plaintiff must establish the state of mind required to prove the underlying violation."). Even assuming they failed to take some step that a reasonable professional would have taken under the circumstances, such a failure is not sufficient to show a violation of Richard's Eighth or Fourteenth Amendment rights. See Estelle, 429 U.S. at 106 (""[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Plaintiff also complains that Conmed staff "received no training about mental illness or to help them understand the agony of mental illness" when "[t]he need for supervision and training as to the provision of appropriate care for mentally ill inmates such as Richard was obvious." (Doc. 468 at 27). Aside from the fact that this argument ignores evidence that Conmed employees actually received on-the-job training, and evidence that Conmed hired licensed professionals whose educational background included training on mental illness, this sort of general criticism is insufficient to meet plaintiff's summary judgment burden, particularly in the context of a claim for failure

to train or supervise. <u>Brown</u>, 520 U.S. at 405 ("rigorous standards of culpability and causation must be applied" to claims based on unconstitutional acts by municipal employees). Plaintiff's general assertions of a failure to train and supervise are not sufficient to withstand Conmed's motion for summary judgment on the § 1983 claims.

    2. <u>Tort of Outrage</u>.

    Plaintiff contends genuine issues of fact exist "as to whether Hall, Skelton, Barnt, Armstrong and/or [Machetlen]'s conduct with regard to [Richard] could be described as extreme and outrageous enough to subject any one of them to liability for Richard's emotional distress and bodily harm...." Doc. 468 at 29. The court disagrees. Under the standards previously set forth, the court concludes plaintiff has failed to cite evidence to meet the threshold of extreme and outrageous conduct that is utterly intolerable in a civilized society. As Conmed argues, plaintiff's complaint against these individuals is essentially that the medical care they provided to Richard was substandard. It does not rise to the level of conduct sufficient for the tort of outrage.

    3. <u>Respondeat superior</u>. Plaintiff's response brief does not address <u>respondeat superior</u>. (Doc. 468). Inasmuch as plaintiff has not shown a genuine issue of fact with respect to any tort claim against any employee of Conmed, Conmed's motion for summary judgment will be granted with respect to any claim for <u>respondeat superior</u> liability.

    For the foregoing reasons, Conmed's motion for summary judgment

will be granted.[16]

### E. **Deputy Saquisha Nelson**

Plaintiff asserts two claims against Saquisha Nelson, both based on § 1983: deliberate indifference to serious medical needs and failure of a bystander officer to intervene. (Doc. 422 at 65-66).

1. <u>Deliberate indifference to medical needs</u>. Nelson contends the evidence fails to show a genuine issue as to whether she was deliberately indifferent to Richard's serious medical needs. In response, plaintiff argues Nelson is liable because she was aware of Richard's psychotic behavior, and "she knew Richard was being abused by inmates and that he was housed in extremely unsanitary conditions," such that "the risk to Richard's health and safety were obvious." (Doc. 473 at 23). Plaintiff argues Nelson should have "contact[ed] a supervisor or Conmed for assistance."

Plaintiff's only evidence that Nelson was aware of "abuse" of Richard was her statement after the February 15 incident that there were "a few inmates that mess with him ... you know [who] come to the door and talk stuff to him." (Doc. 473 at 23, referring to Exh. 44, SG756). For reasons previously stated, evidence of such verbal taunting by other inmates does not amount to a constitutional violation. Similarly, plaintiff fails to substantiate and quantify the

---

[16] Plaintiff's response brief argues plaintiff is entitled to a spoliation instruction relating to missing forms for daily rounds and missing training records for Diaz's class at the academy. (Doc. 468 at 30). As Conmed points out, an adverse inference instruction "must be predicated on the bad faith of the party destroying the records" and "[m]ere negligence in losing or destroying records is not enough...." <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1407 (10th Cir. 1997). To date, plaintiff has cited no evidence of bad faith relating to the loss of these records.

allegation of "extremely unsanitary conditions" and fails to show that the conditions amounted to a constitutional violation. That leaves only Nelson's alleged awareness of a substantial risk of serious harm to Richard, which is described by plaintiff as knowledge that Richard faced a "risk of serious harm due to altercations." (Doc. 473 at 22).

It is clear that Nelson – together with just about everyone else at the jail – was aware that Richard had a serious mental illness. Richard's bizarre behavior was not only well-documented by deputies, it was also conveyed to and clearly known to the Conmed medical staff and the treating psychiatrist, Dr. Murphy. Plaintiff cites no evidence that Nelson failed to relay some critical information regarding Richard's health to supervisors. Nelson was aware that Conmed had been contracted to provide medical care to inmates at the jail, including mental health care, and that Richard was being treated and provided with medications by Conmed. She also knew that Richard was on a racked watch because of his bizarre behavior and that this meant he was segregated from other inmates and was regularly monitored. Plaintiff cites no evidence that Nelson was aware of any altercations involving Richard. Given these circumstances, plaintiff has failed to articulate, let alone show, that Nelson was deliberately indifferent to a substantial risk of serious harm to Richard or that she was deliberately indifferent to his serious medical needs. Nelson's motion for summary judgment is granted on this claim.

2. Failure to intervene. Plaintiff contends Nelson is liable for failing to intervene to stop Diaz from using excessive force on Richard. Nelson moves for summary judgment, arguing that "once [she] appreciated there was no need for additional force ... she told Diaz

to stop hitting Richard," and although Diaz hit Richard two or three more times after that, there is no evidence that Nelson could have intervened to prevent the latter blows. (Doc. 447 at 23).[17]

The particular constitutional provision governing plaintiff's claim is not clear, because courts are divided over whether a detainee awaiting adjudication on a probation violation is a "pretrial detainee" – whose Fourteenth Amendment right to due process prohibits any punishment – or instead a "convicted prisoner" – who under the Eighth Amendment may be subjected to punishment but not if it is "cruel and unusual." See Palmer v. Marion County, 327 F.3d 588, 592–93 (7th Cir. 2003) ("The confusion about the constitutional predicate for Palmer's claims arises from the uncertainty as to whether a detainee awaiting a hearing on a probation violation can be "punished" under the Eighth Amendment.").

Both sides here cite Eighth Amendment law, so the court will apply that standard. Cf. Blackmon v. Sutton, 734 F.3d 1237, 1241 (10th Cit. 2013)("Conduct that violates the clearly established rights of convicts necessarily violates the clearly established rights of pretrial detainees."). Under the Eighth Amendment, Diaz's underlying use of force is judged by the following: "[w]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

---

[17] Nelson does not raise the defense of qualified immunity in her motion.

Plaintiff contends Deputy Nelson violated Richard's rights by failing to intervene and stop Diaz. A correction officer's failure to intervene in an unlawful beating can violate the Eighth Amendment if the officer had a reasonable opportunity to intervene and refused to do so. See Jackson v. Austin, 241 F.Supp.2d 1313, 1322 (D. Kan. 2003) (citing cases). See also Fogarty v. Gallegos, 523 F.3d 1147, 1162 (10th Cir. 2008)(applying principle in Fourth Amendment context). The officer must have had "a realistic opportunity to intervene to prevent harm from occurring." Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." Vondrak, 535 F.3d at 1210 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2nd Cir. 1994)). On an Eighth Amendment claim, it must also be shown that the bystander officer knew of but was deliberately indifferent to an excessive risk to the inmate's safety. Austin, 241 F.Supp.2d at 1322. In other words, it must be shown that the officer had reason to know that the force being used was unlawful. Cf. Vondrak, 535 F.3d at 1210.

Although it presents a close call, when the facts are viewed in the light most favorable to plaintiff, there is a genuine issue whether Deputy Nelson had a realistic opportunity to intervene earlier to prevent Diaz from inflicting punishment. A reasonable jury could find that Diaz applied force amounting to cruel and unusual punishment almost from the outset of his encounter with Richard. It could further find that Nelson must have realized shortly thereafter that Diaz was

acting for the purpose of causing harm and was not engaging in a good-faith effort to restore order. It is up to a jury to decide whether or not to credit Nelson's assertion that she was "dazed" by the circumstances for some unknown amount of time, after which she attempted to stop Diaz by yelling something along the lines of "that's enough." It is true that the entire episode probably lasted less than a minute, and several courts have said a very brief attack ordinarily offers no realistic opportunity to intervene. <u>See</u> <u>e.g.</u>, <u>Ontha v. Rutherford County, Tenn.</u>, 222 Fed.Appx. 498, 506 (6th Cir. 2007) (listing cases finding no duty to intervene where incident unfolds "in a matter of seconds"); <u>Gaudrealt v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 207, n. 3 (1st Cir. 1990) (no realistic opportunity to intervene where attack was over in a matter of seconds). But the evidence here suggests Diaz's beating of Richard extended well beyond a few seconds, and Nelson was in very close proximity while Diaz rained blows down on a non-resistant Richard. The number of blows struck by Diaz – one witness estimated it was 20 – could lead a jury to conclude that Nelson had sufficient time to perceive and react sooner to what was, at least on this record, a grossly excessive use of force amounting to cruel and unusual punishment. Accordingly, Nelson's motion for summary judgment on this claim is denied.

### F. <u>Gary Steed, Robert Hinshaw, and Sedgwick County</u>

Plaintiff apparently asserts a § 1983 claim against Steed and Hinshaw in their personal capacities for failure to supervise, as well as an official capacity claim against the Office of Sheriff (i.e. Sedgwick County) for a failure to train. He asserts a state law claim for <u>respondeat</u> <u>superior</u> liability against Steed, Hinshaw and Sedgwick

County. (Doc. 422 at 65). Steed, Hinshaw and Sedgwick County move for summary judgment only on the § 1983 claims. (Doc. 447).

Sifting through the laundry list of allegations in plaintiff's response, the court is able to identify the following as the actions or failures for which plaintiff contends Steed, Hinshaw and/or Sedgwick County bear liability: a failure to train detention deputies "on safely housing and interacting with mentally ill inmates;" a custom of ridiculing mentally ill inmates; improper photographs of Richard taken at the hospital and at the clinic; failing "to seek treatment for Richard, within or outside the facility"; failing to provide training or policies for administration of involuntary injections when inmates pose a risk of harm; failing to discipline or monitor Diaz after repeated use-of-force incidents in the jail; and failing to properly investigate the February 15 incident. (Doc. 422 at 26-28).

1. Hinshaw - no personal involvement.

As an initial matter, plaintiff fails to cite any evidence of any personal involvement by Robert Hinshaw in any violation of Richard's rights. Steed was the sheriff until December 2008 and had final policy-making authority over operation of the jail. Hinshaw was the undersheriff until December 2008 when he became sheriff. Plaintiff cites no evidence that Hinshaw was personally responsible for any failure to supervise or train in the relevant time frame. Plaintiff appears to argue that Hinshaw is responsible because he "served directly under the Sheriff in the chain of command for detention operations." (Doc. 473 at 25). That allegation is insufficient to show Hinshaw's personal responsibility for training detention deputies or

to show that he "promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused constitutional harm. See Dodds, 614 F.3d at 1199.

2. Steed / Sedgwick County.

a. Failure to train on mental illness.

Plaintiff's first argument against Steed and/or Sedgwick County is they are liable for failing to require training "on safely housing and interacting with mentally ill inmates." Aside from arguing that the need for such training was obvious, plaintiff argues Steed had notice of this deficiency from a 2003 study of the jail's medical services. (Doc. 475-12). The study made a multitude of recommendations. It is not clear how many were ultimately adopted. One of the recommendations was that Sedgwick County establish an agreement with a provider for mental health care, which the County apparently did through its agreement with Conmed. Plaintiff accurately points out the study also recommended training for jail staff on the signs and symptoms of mental illness and on the procedures for sharing this information with medical staff. Plaintiff thus argues the study informed Steed that the jail's practices relating to mentally ill inmates "were extremely deficient." No cite is provided for that assertion, and the court finds no such finding in the study. On the contrary, while it identified a number of areas that were lacking and could be improved, including counseling and support services for inmates, the report also stated that "the [current] coverage for serious conditions is probably adequate...."

The most glaring problem with plaintiff's complaint about a lack of training on mental illness is the failure to show a connection to

any violation of Richard's rights. Jail staff clearly recognized Richard's bizarre behavior as evidencing mental illness and conveyed that information, through one means or another, to Conmed medical personnel. The medical staff including the treating psychiatrist were clearly aware of Richard's psychotic behavior and mental illness. On this record the only evidence supporting a potential claim for denial of medical care is Dr. Murphy's failure to act on his conclusion that Richard needed hospitalization. But there is no evidence of a link between that decision and a failure to train jail staff on mental illness.

Nor does plaintiff show a sufficient link between any such lack of training and an inappropriate use of force by Diaz or Nelson during the February 15 incident. The record shows that deputies were appropriately trained on the use of force in the jail. The contention that if Diaz had been better trained about mental illness he would have had more empathy for Richard and would have avoided using excessive force is pure speculation. It provides no basis for holding Steed or the County liable for Diaz's use of excessive force. Nor does plaintiff's evidence of a "custom" of jail staff ridiculing the mentally ill. The fact that jail staff sometimes made tasteless comments does not demonstrate that mistreatment of mentally ill inmates was "so permanent and well settled as to constitute a custom or usage with the force of law," Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010). Nor does it show that such a custom was a moving force behind the violation of Richard's constitutional rights. As for the improper photographs of Richard taken while he was in custody, the evidence fails to show who, how, or why those

photographs were taken. Absent some evidence linking them to Steed or to a policy or custom for which he was responsible, they provide no basis for § 1983 recovery against Steed or the County.

Plaintiff's failure to train claims require him to show that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989); <u>Porro v. Barnes</u>, 624 F.3d 1322, 1328 (10th Cir. 2010). "It isn't enough to 'show that there were general deficiencies in the county's training program for jailers.'" <u>Porro</u>, 624 F.3d at 1328. While the 2003 report on jail medical services may have alerted Steed to a training deficiency on dealing with mentally ill inmates, the evidence does not show he was aware of an inadequacy "so likely to result in the violation of constitutional rights" that he could be said to be deliberately indifferent to the rights of mentally ill inmates. As noted in the 2003 report, the jail's current practices for serious treatment "was probably adequate" despite the lack of training on mental illness. The evidence does not show that Steed was aware of a likelihood that an officer in Diaz's situation would engage in a wholly disproportionate and malicious use of force simply because the deputy had not had more specific training on dealing with mentally ill inmates. <u>Brown</u>, 520 U.S. at 404 (plaintiff must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights"). Defendants' motion for summary judgment on this claim must be granted.

    b. <u>Failures relating to medical care</u>.

Two of the alleged failures identified by plaintiff in his response deal specifically with medical care. The first is the sheriff's alleged failure "to seek treatment for Richard, within or outside the facility." The second is the lack of jail training or policies for administration of involuntary medication. Neither of these failures provides grounds for § 1983 relief.

Sedgwick County contracted with Conmed to provide medical care to detainees in accordance with prevailing jail standards. Conmed was undeniably providing medical services to Richard and other inmates at the jail, including prescribing and offering appropriate antipsychotic medications. It employed an experienced board-certified psychiatrist and mental health staff, including a full-time physician's assistant, nurses and licensed social workers, to provide medical and mental health care. Plaintiff cites nothing to show that Steed had reason not to rely on the judgment or services of the medical professionals treating Richard and other inmates. Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."); Lynch v. Jackson, 478 Fed.Appx. 613, 619 (11th Cir. 2012) ("Prison officials who rely on medical personnel for the clinical determinations lack the requisite knowledge for deliberate indifference, absent evidence that clinical determination were unreliable."). Richard's continuing psychosis is no proof of that fact. Even with the best of care a person could show persistent psychotic behavior, as Richard himself previously did for several months while being treated at a state hospital. Nor does

Steed's failure to seek treatment for Richard outside the jail show deliberate indifference. Although Dr. Murphy concluded that Richard should be hospitalized, he never conveyed that fact to Steed, and Steed could not be expected to recognize when psychiatric hospitalization is medically necessary.

Finally, a jury could not reasonably infer Steed's deliberate indifference from a lack of jail training or policies relating to involuntary administration of medication. Plaintiff cites no evidence of any prior episode that would have alerted Steed to the need for such training or policies. A sheriff with no medical training cannot be expected to second-guess the judgment of medical professionals as to when the involuntary administration of antipsychotic medication is medically necessary. See Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) ("The law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision."). This is particularly true when Steed could have reasonably believed that any serious danger posed by Richard's behavior was controlled through segregated housing, regular observation and monitoring of his condition by jail staff and Conmed, and medical treatment provided by credentialed professionals.

    c. Failure to discipline.

Plaintiff's final claims against Steed and Sedgwick County are based on the failure to discipline or monitor Diaz after his prior use of force incidents, as well as an alleged failure to properly investigate the February 15 incident. The court first notes plaintiff has failed to cite admissible evidence of any widespread jail practice of failing to discipline unconstitutional uses of excessive force.

Notwithstanding plaintiff's reference to certain other incidents, plaintiff essentially fails to identify admissible evidence of such a custom or policy.[18] The admissible evidence cited here pertains only to Diaz and his use of force.

The uncontroverted facts show that Diaz underwent two administrative reviews because of his involvement in a number of use-of-force events. Although the fact of such reviews shows that Diaz was involved in a significant number of incidents, that by itself does not show he was prone to use excessive or improper force. With one exception the reviews concluded that he acted properly and that the occasion for use of force arose merely because of his position as a deputy. The lone exception occurred when Diaz was found to be justified in using force but should have, according to sheriff's policy, used a lesser strike against a resistive inmate, such as a palm strike or an ear slap, instead of a closed fist. Both reviews recommended that Diaz be monitored; the second recommended a refresher course on distraction techniques. Despite a lieutenant's endorsement on the second report adding that Diaz should be counseled and the counseling should be documented, the evidence indicates that no such counseling, refresher course or monitoring occurred.

Plaintiff points to no evidence of Steed's personal knowledge or

---

[18] As noted in defendants' reply brief (Doc. 486-1 at 11-12), plaintiff's attempt to establish a pattern of prior incidents (Doc. 473 p. 19, ¶33) suffers from a number of problems, including: reliance upon second-hand hearsay statements about the use of excessive force; testimony not shown to be based on personal knowledge of the witness; testimony about an incident in 1997 before Steed was sheriff; testimony about an incident making fun of mentally ill people in 2011 after the events of this case; and citation to unsworn and vague statements.

involvement in any of this, except for the fact he was the jail's final policy-maker. To hold Steed or the County liable in such circumstances, plaintiff must first identify a policy or custom that caused Richard's injury. Brown, 520 U.S. at 404. Locating a policy ensures that a county is held liable only for those deprivations resulting from officials whose acts may fairly be said to be those of the county, while a custom is fairly attributable to a county because it is so widespread as to have the force of law. Plaintiff fails to cite evidence establishing the required policy or custom.

Although the failure of jail staff to counsel or monitor Diaz after it was ordered by a superior officer is troubling – and indicative at least of someone's negligence – this failure alone cannot substantiate a jail policy or custom of failing to discipline excessive force. Moreover, deliberate indifference "does not mean a collection of sloppy, or even reckless oversights; it means evidence showing an obvious, deliberate indifference" to the alleged violation. Thomas v. City of Chattanooga, 398 F.3d 426, 433 (6th Cir. 2005). See Brown, 520 U.S. at 407 (deliberate indifference not met by a showing of simple or even heightened negligence). Cf. Schneider, 717 F.3d at 777 ("Rarely if ever is 'the failure of a police department to discipline in a specific instance ... an adequate basis for municipal liability under Monell....") [citations omitted].

Lastly, plaintiff contends the jail's investigation of the February 15 incident was a "whitewash" of Diaz's improper use of force. It is exceedingly hard to fathom how the investigation initially concluded that Diaz's use of force was not excessive. But even assuming the initial investigation was inadequate or flawed, it

could not have been the legal cause of any of Richard's injuries from the February 15th beating. See also Bryson v. City of Okla. City, 627 F.3d 784, 790 (10th Cir. 2010) (city's subsequent misdeeds were irrelevant to whether city previously ignored a risk of harm).

Accordingly, Steed and Sedgwick County's motion for summary judgment is granted as to plaintiff's § 1983 claims.

## V. Summary of Remaining Claims

In view of the foregoing ruling and the claims asserted in the pretrial order (Doc. 422 at 65-66), the following defendants and claims remain for trial:

Manuel Diaz - plaintiff's § 1983 claims for excessive use of force, deliberate indifference to mental health needs, and failure to protect; and a state law claim for the tort of outrage;

Paul W. Murphy - plaintiff's §1983 claim for deliberate indifference to serious medical needs;

Saquisha Nelson - plaintiff's § 1983 claim for failure to intervene; and

Office of Sedgwick County Sheriff (Sedgwick County) - plaintiff's state law claim for respondeat superior.

## VI. Pretrial Deadlines.

The court hereby modifies the pretrial order deadlines in the following respects:

- Motions in limine are due Friday, Feb. 28, 2014. Responses to motions in limine are due Monday, March 10, 2014. These dates will not be extended for any reason. In limine motions are limited to a total of 10 double-spaced pages per party, irrespective of the number of in limine requests. Plaintiff's response to defendants' motions shall not

exceed a total of 20 double-spaced pages, regardless of the number of defendants' motions. Defendants' response to plaintiff's motion shall not exceed 10 pages for <u>all</u> defendants. It will be up to defendants' counsel to work this out. Do not call my law clerks for advice or clarification. These page limits will not be increased for any reason. No replies shall be filed.

- Final witness and exhibit disclosures and deposition testimony designations are due <u>Friday, Feb. 28, 2014</u>. Counsel shall submit complete deposition transcripts (not just excerpts) with respect to any designations. Objections to disclosures and objections to deposition designations (with any counter-designations) are due <u>Monday, March 10, 2014</u>. Page limits are the same as for motions in limine.

- Proposed jury instructions are due <u>Monday, March 10, 2014.</u> Counsel should submit only substantive ("gut") instructions; the court's standard instructions concerning burden of proof, credibility of witnesses, et cet., are on the court's website and need not be submitted.

A final status conference is hereby set for <u>Monday, March 17, 2014 at 1:30 p.m.</u>

## VII. Conclusion.

Defendant Murphy's motion for summary judgment (Doc. 444) is DENIED as to plaintiff's § 1983 claim for deliberate indifference to medical needs. It is GRANTED in all other respects;

The joint motion for summary judgment of the Conmed defendants (CMHI, Conmed Inc., and Hall) (Doc. 440) is GRANTED;

The joint motion for summary judgment of the Sedgwick County defendants (Bd. of Sedgwick County Comm'rs., Sedgwick County Sheriff, Hinshaw, Steed, and Nelson) (Doc. 446) is GRANTED except for the § 1983 claim against Nelson for failure to intervene. The motion is DENIED as to that claim.

No motions to reconsider, for "clarification," nor any similar such motions shall be filed.

IT IS SO ORDERED.

Dated this 18th day of February 2014, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE